[Cite as *State v. Turner*, 2024-Ohio-684.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29785 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 03241 |
| | : | |
| TIANDRE L. TURNER | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 23, 2024

. . . . . . . . . . .

CHIMA R. EKEH, Attorney for Appellant

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Tiandre L. Turner, appeals from his convictions in the Montgomery County Court of Common Pleas after a jury found him guilty of multiple counts of rape, kidnapping, abduction, felonious assault, and assault. In support of his appeal, Turner contends that the trial court erred by denying his motion to sever the charges as to each victim. Turner also claims that the trial court erred by failing to merge several of his

offenses at sentencing.   For the reasons outlined below, the judgment of the trial court will be affirmed.

### Facts and Course of Proceedings

{¶ 2} On January 23, 2022, and January 13, 2023, a Montgomery County grand jury returned indictments charging Turner with four counts of rape, five counts of kidnapping, four counts of abduction, two counts of felonious assault, two counts of robbery, and one count of assault.   The 18 charges pertained to four separate victims. All of the charged offenses and corresponding victims are set forth below:

Victim: C.B.

| | | |
|---|---|---|
| Rape (by force or threat of force) | F1 | R.C. 2907.02(A)(2) |
| Felonious Assault (serious physical harm) | F2 | R.C. 2903.11(A)(1) |
| Robbery (physical harm) | F2 | R.C. 2911.02(A)(2) |
| Abduction (retrain/sexual motivation) | F3 | R.C. 2905.02(A)(2)/(B) |
| Kidnapping (felony or flight) | F1 | R.C. 2905.01(A)(2) |
| Kidnapping (sexual activity) | F1 | R.C. 2905.01(A)(4) |

Victim: C.T.

| | | |
|---|---|---|
| Rape (by force or threat of force) | F1 | R.C. 2907.02(A)(2) |
| Assault | M1 | R.C. 2903.13(A) |
| Abduction (restrain/sexual motivation) | F3 | R.C. 2905.02(A)(2)/(B) |
| Kidnapping (sexual activity) | F1 | R.C. 2905.01(A)(4) |

Victim: H.C.

| | | |
|---|---|---|
| Rape (by force or threat of force) | F1 | R.C. 2907.02(A)(2) |
| Felonious Assault (serious physical harm) | F2 | R.C. 2903.11(A)(1) |
| Abduction (restrain) | F3 | R.C. 2905.02(A)(2) |

| Abduction (restrain/sexual motivation) | F3 | R.C. 2905.02(A)(2)/(B) |
|---|---|---|

Victim: C.W.

| Rape (by force or threat of force) | F1 | R.C. 2907.02(A)(2) |
|---|---|---|
| Kidnaping (felony or flight) | F1 | R.C. 2905.01(A)(2) |
| Kidnapping (sexual activity) | F1 | R.C. 2905.01(A)(4) |
| Robbery (physical harm) | F2 | R.C. 2911.02(A)(2) |

{¶ 3} Turner pled not guilty to the foregoing charges, and the matter was scheduled for a jury trial. At a pretrial conference, Turner moved the trial court to sever the charges so that he could be tried separately as to each victim. In support of the motion to sever, Turner argued that all of the victims' allegations were similar in nature and would confuse the jury if presented together at a single trial. Turner also argued that the sheer number of alleged victims would prejudice him in the eyes of the jury.

{¶ 4} In ruling on the motion to sever, the trial found that Turner would not be prejudiced by joinder of the charges because the anticipated evidence supporting each charge was going to be simple and direct and would not confuse the jury. Accordingly, the trial court denied Turner's motion to sever and proceeded with a single jury trial on all of the charges.

{¶ 5} At trial, the State presented testimony from three of the four victims, C.B., H.C., and C.W. The fourth victim, C.T., did not testify because she had passed away in 2020. In addition to the three victims, the State presented testimony from the medical professionals who examined and treated the victims and the law enforcement officers who investigated the offenses in question. The State also presented testimony from

various DNA experts who had extracted, analyzed, and compared DNA profiles that were associated with each of the victims' cases. Turner also testified in his defense. The following is a summary of the information that was presented at Turner's trial.

*Rape of C.B.*

{¶ 6} During the early morning hours of June 26, 2013, C.B. and her former fiancé were in Dayton walking on North Main Street to a gas station so that they could buy some cigarettes. While they were walking, a black male wearing a McDonald's uniform pulled his vehicle beside them and offered to give C.B. a ride. C.B. accepted the ride and left her former fiancé behind. Instead of taking C.B. to the gas station as represented, the man took C.B. to a parking lot at an apartment complex on 4032 North Main Street. The man parked his vehicle in a secluded area of the parking lot that was not well lit.

{¶ 7} After parking, C.B. and the man exited the vehicle. A physical struggle ensued between C.B. and the man outside the passenger side of the vehicle because he was trying to force C.B. to have sexual intercourse with him. The man removed C.B.'s shorts and shoes during the physical struggle. The man thereafter positioned himself behind C.B., bent C.B. over the passenger seat of the vehicle, and raped her through forced vaginal intercourse.

{¶ 8} During the physical struggle, the man struck C.B. in the face once and broke her nose. C.B. lost consciousness for a moment as a result of his striking her. C.B. could not remember whether she was struck inside or outside the vehicle, but she did recall that she was struck sometime before the rape. When the man finished raping

C.B., he threw her body away from his vehicle and drove off, leaving C.B. stranded in the parking lot half naked. C.B. claimed that the male took her shoes and her shorts, which contained her cigarette money.

{¶ 9} After the rape, C.B. wanted to call 9-1-1, but her cell phone, which she had with her before the attack, was nowhere to be found. As a result, C.B. began knocking on doors and walking down the street looking for help. Someone called the police and reported a woman walking around the area of North Main Street and Siebenthaler Avenue with no pants on. An officer responded to the call and found C.B. on North Main Street without any pants or shoes, bleeding and crying. C.B. reported to the officer that she had been sexually assaulted and described her assailant as a lighter-skinned black male wearing a McDonald's uniform. C.B. also advised that the man was approximately 30 years old, six feet tall, 200 pounds, and that he had a short afro and large front teeth. The officer found C.B.'s shorts and sneakers strewn about the parking lot at 4032 North Main Street, which was six or seven blocks from where the officer had found C.B.

{¶ 10} C.B. was taken to the hospital and underwent a sexual assault nurse examiner ("SANE") exam. The nurse who conducted the SANE exam observed that C.B. had a swollen nose with an abrasion on it. The nurse also observed contusions on the tip of C.B.'s tongue and left elbow. C.B. told the nurse that her assailant had raped her, pushed her on the ground, punched her in the face, and stomped on her chest. Although the nurse did not observe any injuries to C.B.'s chest, a detective who interviewed C.B. the next day did observe bruising to C.B.'s chest, as well as her broken nose. During the SANE exam, the nurse took swabs from various areas of C.B.'s body,

including her vagina. The swabs and C.B.'s clothing were taken to the Miami Valley Regional Crime Lab ("MVRCL") for analysis and testing.

*Rape of C.T.*[1]

{¶ 11} On January 30, 2014, C.T. was walking on Main Street in Dayton when she saw a black man leaning on a parked vehicle with its headlights on. C.T. approached the vehicle to see if the male needed any assistance. When C.T. approached, the man pushed her inside his vehicle and drove her to West Grand Avenue, where he demanded C.T. perform fellatio on him. When she refused, the male punched C.T. in the face three times and asked "if [she'd] give him head now." Trial Tr. Vol. V, p. 591. C.T. once again refused. The man punched her in the head one more time and said, "how about now?" *Id*. At that point, C.T. told the man that she would do whatever he wanted as long as he stopped punching her. The man then instructed C.T. to take off her pants, and C.T. complied. Once C.T. removed her pants, the man raped her through vaginal intercourse and ejaculated on her upper thighs and vaginal area. Thereafter, the man pushed C.T. out of his vehicle and tossed her belongings to her. C.T. then knocked on a door for help and called the police.

{¶ 12} The police were dispatched to 1830 West Grand Avenue, where they met with C.T. C.T. reported to the officers that she had been raped and described her assailant as a black male in his late 20s with a medium build. C.T. also reported that the

---

[1]The information pertaining to the rape of C.T., who died in 2020, was obtained from the testimony of the SANE nurse who examined her and the investigating law enforcement officers.

man had been wearing dark jeans and a hat with a ball on top of it. C.T. reported that the rape had occurred behind the residence at 1951 West Grand Avenue.

{¶ 13} The police took C.T. to the hospital, where she received a SANE exam. During the exam, the attending nurse observed bruising and swelling to C.T.'s right eye, upper lip, and cheek area. The nurse swabbed various parts of C.T.'s body, including her vagina and the area where the assailant had ejaculated on her. The swabs were then taken to the MVRCL for analysis and testing.

*Rape of H.C.*

{¶ 14} On the afternoon of March 25, 2014, H.C. was walking by herself in the area of Fourth Street in Dayton when a vehicle pulled up beside her. The driver, a black male who H.C. recalled having short hair and crooked, long teeth, offered her a ride. H.C. was reluctant to get in the vehicle, but the man was persistent in offering her a ride. The man asked H.C. if she wanted to smoke a blunt with him at his grandfather's house. H.C. accepted the man's offer and got into his vehicle. The man then took H.C. to a house at 1957 West Grand Avenue. Almost immediately upon entering the house, H.C. realized that they were not at the man's grandfather's house, as the house had no furniture and appeared to have been abandoned.

{¶ 15} Once inside the house, H.C. got into a verbal argument with the man about smoking. Thereafter, the man became violent with H.C., and H.C. ran up the stairs of the house to get away from him. The man, however, grabbed H.C. and dragged her down the stairs. After dragging her down the stairs, the man ripped off H.C.'s shirt and

leggings and raped her on the stairs through vaginal intercourse while she was trying to crawl away. Following the rape, H.C. wrestled and fought with the man on the stairs. The man then picked up H.C. and body-slammed her to the floor, which injured H.C.'s back and left her in excruciating pain. After being body-slammed, H.C. was on the floor while the man was on top of her and punching her. The man continued to punch H.C. until he eventually stopped to look for his car keys. Despite being in excruciating pain, H.C. used that opportunity to escape from the house and call the police.

{¶ 16} The police responded to H.C.'s call, and officers met her a couple of streets south of where she had been attacked at 1957 West Grand Avenue. H.C. told the officers about the attack and directed them to the abandoned house. At the house, the officers photographed the scene and collected evidence. Inside the house, officers found one of H.C.'s shoes, a purse, and items of makeup. The officers also discovered a puddle of semen on the floor. A sample of the semen was collected by evidence technicians and sent to the MVRCL for analysis.

{¶ 17} After speaking with the officers, H.C. was taken to the hospital and underwent a SANE exam. Various parts of H.C.'s body, including her vagina, were swabbed during the SANE exam. The swabs were then sent to the MVRCL for analysis. While at the hospital, H.C. also received a CAT scan. The CAT scan revealed that H.C. had a lumbar compression fracture to her spine. As a result of that injury, H.C. had to wear a back brace and undergo physical therapy so that she could relearn how to walk.

*Rape of C.W.*

{¶ 18} On April 7, 2014, at around 12:30 in the afternoon, C.W. was walking alone in an alley behind 1957 West Grand Avenue in Dayton when a black man grabbed her by the arms and dragged her into the same abandoned house in which H.C. had been raped two weeks earlier. Once inside the house, the man told C.W. to put her jacket on the floor and to get down on all fours like a dog. C.W. followed the man's instructions because she was scared that he was going to hurt her with something that he had in his hand—something that appeared to be a gun or a rock. The man then started raping C.W. through vaginal intercourse.

{¶ 19} C.W. observed that the man had ejaculated beside her on the floor and that some of his ejaculate had landed on her jacket. When the man was finished, he struck C.W. on the back of the head, causing her to black out for a moment. When C.W. regained consciousness, she saw the man driving off in a vehicle. C.W. also noticed that her purse, money, and cell phone were missing. Thereafter, C.W. wandered out on the street and found someone in the area to call the police for her.

{¶ 20} Police officers were dispatched to an apartment building at 1938 West Grand Avenue on the call of a rape and robbery. When the officers arrived, C.W. was visibly upset and crying. The officers observed that C.W. had injuries to her arm and the side of her head. C.W. reported to the officers that she had been assaulted in a house on 1957 West Grand Avenue. The officers then went to that location and collected evidence. The officers collected a water bottle and a sample of semen that was found on the living room floor.

{¶ 21} After speaking with the officers, C.W. was taken to the hospital and

underwent a SANE exam. During the exam, the nurse observed injuries on C.W.'s right elbow, right upper thigh, and below her left eye. C.W. told the nurse that her assailant had ejaculated on her jacket. As a result, C.W.'s jacket and various swabs taken during the SANE exam were sent to the MVRCL for analysis.

*DNA Evidence*

{¶ 22} DNA analyst Mary Barger, f.k.a. Mary Sisto, from the MVRCL was able to develop suspect DNA profiles for all four of the victims' cases. The suspect DNA profiles were obtained from the swabs taken at C.B. and C.T.'s SANE exams, the semen that was collected from the floor of 1957 West Grand Avenue in H.C.'s case, and the semen that was swabbed from C.W.'s jacket. Comparing the suspect DNA profiles obtained in each case, Barger was able to determine that the DNA profiles were identical, i.e., that the same suspect was involved in all four cases. The only problem was that the identity of the suspect was unknown. Without that information, the four rape cases went cold and closed in 2015.

{¶ 23} In 2020, two cold-case detectives from the Montgomery County Sheriff's Office and the Dayton Police Department asked the Ohio Bureau of Criminal Investigation ("BCI") to further analyze the suspect DNA profile. Specifically, the detectives asked BCI to perform a familial search using the Combined DNA Index System ("CODIS"), which is a database of DNA profiles that have been collected from arrestees and convicted felons across the country. During a familial search, CODIS is used to find possible relatives who are linked to the unidentified DNA profile. Using this method, DNA analyst Diane

Gheres from BCI was able to find two relatives of the unknown suspect. The relatives were Gregory Pierce and Clifford Pierce—Turner's father and uncle. From those relatives, the detectives learned about Turner and conducted surveillance on him. Upon doing so, the detectives discovered that Turner matched the victims' physical description of their assailant.

{¶ 24} The detectives thereafter went to Turner's residence and conducted a trash pull for the purpose of obtaining a surreptitious DNA sample to compare with the suspect DNA profile. The trash pull yielded some cigar mouthpieces that the detectives sent to BCI for analysis. The results of the BCI analysis determined that the DNA extracted from the cigar mouthpieces was a 100% match with the suspect DNA profile. Based on that evidence, officers were able to obtain a search warrant for Turner's DNA standard. After obtaining Turner's DNA standard, DNA analyst Erika Jimenez from BCI compared the standard to the suspect DNA profile associated with each of the four rape cases; Jiminez concluded that Turner's DNA was present in each case, i.e., on C.W.'s jacket, on the living room floor in H.C.'s case, and on the swabs taken at C.B. and C.T.'s SANE exams.

*Turner's Interview with Detectives and Subsequent Arrest*

{¶ 25} Detectives interviewed Turner during the execution of the search warrant for his DNA standard. During the interview, Turner was wearing a hat with a ball on it similar to the one that C.T. had described her assailant wearing. In addition, Turner told the detectives that he had worked at a McDonald's on Needmore Road in Dayton for 15 years. When the detectives showed Turner photographs of the victims, Turner denied

having sex with any of them. Sometime later, the detectives arrested Turner after receiving the results of the BCI DNA analysis showing that Turner's DNA standard matched the suspect DNA profile. When the detectives arrived at Turner's place of employment to arrest him, Turner fled and hid in a wooded area until he was eventually apprehended.

*Turner's Trial Testimony*

{¶ 26} Turner testified that, during the time period in question, he had a fetish for soliciting prostitutes. Turner also testified that he regularly shorted prostitutes, i.e., failed to pay them the agreed upon amount for their services. Turner admitted that he had lied to the detectives about having sex with the four victims in question, but also claimed that he did not initially recognize the victims when their photographs were shown to him. Turner testified that all four victims were prostitutes with whom he had had consensual sexual encounters. Turner denied hitting or physically harming any of the victims but admitted to leaving the victims stranded after failing to pay them.

*Verdict and Sentencing*

{¶ 27} After the parties rested their cases, the jury deliberated and found Turner guilty of all the charges except for the charges of robbery pertaining to C.B. and C.W. Following the jury's verdict, Turner filed a motion for new trial. In the motion, Turner argued that trying all of the charges together had prejudiced him. The trial court denied the motion; it once again found that the charges were separate and distinct and were not

confusing to the jury.   The trial court also found that, based on Turner's testimony, even if separate trials had been allowed, the evidence pertaining to each victim would have been properly admissible as other acts evidence under Evid.R. 404(B).

{¶ 28} After denying Turner's motion for new trial, the matter proceeded to sentencing.   The trial court did not merge any of the 16 offenses of which Turner was found guilty.   The trial court imposed an aggregate term of 44 years to life in prison and designated Turner a Tier III sex offender.

{¶ 29} Turner now appeals from his convictions, raising seven assignments of error for review.

**First Assignment of Error**

{¶ 30} Under his first assignment of error, Turner challenges the trial court's decision denying his motion to sever the charges so that he could be tried separately as to each victim.   Turner claims that he was prejudiced by the improper joinder of unrelated charges.   We disagree.

*Standard of Review*

{¶ 31} Ordinarily, an appellate court reviews a trial court's ruling on a motion to sever for an abuse of discretion.   *State v. Pate*, 2021-Ohio-1838, 173 N.E.3d 567, ¶ 36 (2d Dist.), citing *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 106; *State v. Snowden*, 2019-Ohio-3006, 140 N.E.3d 1112, ¶ 48 (2d Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990).   However, "[w]here a defendant

fails to renew a motion to sever at the close of the state's case or the close of all evidence, * * * he waives all but plain error on appeal." (Citations omitted.) *State v. Shivers*, 8th Dist. Cuyahoga No. 106601, 2018-Ohio-5174, ¶ 89. *Accord State v. Stargell,* 2016-Ohio-5653, 70 N.E.3d 1126, ¶ 12 (2d Dist.); *State v. Kocevar*, 2023-Ohio-1513, 213 N.E.3d 1240, ¶ 15 (2d Dist.). Plain error arises only when, "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id*. at paragraph three of the syllabus.

{¶ 32} In this case, although Turner filed a post-verdict motion for new trial arguing that the joinder of the unrelated charges prejudiced him, Turner failed to renew his pretrial motion to sever either at the end of the State's case or at the conclusion of the evidence. Therefore, Turner has waived all but plain error with regard to the severance/improper joinder issue.

*Joinder and Severance of Charges*

{¶ 33} Multiple offenses may be charged in the same indictment if the offenses "are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Crim.R. 8(A). Joinder of such charges is favored "because it conserves time and financial resources, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous

results in successive trials before different juries." (Citations omitted.) *State v. Mitchell,* 2d Dist. Clark Nos. 97-CA-0048 and 97-CA-0049, 1998 WL 27994, *2 (Jan. 6, 1998). *Accord State v. Smith,* 2d Dist. Montgomery No. 29597, 2023-Ohio-4565, ¶ 15*, citing State v. Broadnax*, 2d Dist. Montgomery No. 21844, 2007-Ohio-6584, ¶ 33 and *State v. Hamblin,* 37 Ohio St.3d 153, 158, 524 N.E.2d 476 (1988).

{¶ 34} " 'Notwithstanding the policy in favor of joinder,' Crim.R. 14 permits a defendant to request severance of the counts in an indictment 'on the grounds that he or she is prejudiced by the joinder of multiple offenses.' " *Ford,* 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 104, quoting *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 49. "The defendant 'has the burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.' " *Id.*, quoting *State v. Torres*, 66 Ohio St.2d 340, 343, 421 N.E.2d 1288 (1981).

{¶ 35} "Even if the equities support severing the charges, the State can overcome the defendant's claim of prejudicial joinder in two ways." *Smith* at ¶ 17. "First, the State can show that it could have introduced evidence of the joined offenses as other acts under Evid.R. 404(B)." *Id.*, citing *Ford* at ¶ 104. That is, "[i]f in separate trials the state could introduce evidence of the joined offenses as 'other acts' under Evid.R. 404(B), a defendant cannot claim prejudice from the joinder." (Citations omitted.) *LaMar* at ¶ 50. "Alternatively, the State can show that the evidence of each crime joined at trial is 'simple and direct.' " *Smith* at ¶ 17, quoting *Ford* at ¶ 104. (Other citations omitted.) " '[W]hen simple and direct evidence exists, an accused is not prejudiced by joinder regardless of'

whether the evidence is admissible as other-acts evidence." *State v. Coley*, 93 Ohio St.3d 253, 260, 754 N.E.2d 1129 (2001), quoting *Lott*, 51 Ohio St.3d 160 at 163, 555 N.E.2d 293.

{¶ 36} Evidence is simple and direct if the jury can readily separate the proof required for each offense, the evidence is straightforward and unlikely to confuse jurors, and if there is little danger that the jury would improperly consider testimony on one offense as corroborative of the other. *State v. Morgan*, 2d Dist. Clark No. 2018-CA-103, 2019-Ohio-3691, ¶ 79. "Joinder may be prejudicial when the offenses are unrelated and the evidence as to each is very weak, * * * but it is otherwise when the evidence is direct and uncomplicated and can reasonably be separated as to each offense." (Citations omitted.) *Torres* at 343-344.

{¶ 37} In this case, the trial court denied Turner's pretrial motion to sever after applying the simple and direct test. Specifically, the trial court found that the anticipated evidence supporting each charge was going to be simple and direct and would not confuse the jury. After hearing all of the evidence presented at trial, the trial court reiterated that decision when it later denied Turner's post-verdict motion for new trial. The trial court also found that, based on Turner's trial testimony, even if the charges had been severed and tried separately as to each victim, the evidence pertaining to the other victims would have been properly admissible as other acts evidence under Evid.R. 404(B).

{¶ 38} Upon review, we find that the trial court's analysis under the simple and direct test did not constitute plain error or an abuse of discretion. We agree that the

evidence supporting the charges as to each victim was separate, distinct, straightforward, and easy to follow. This is demonstrated by the fact that the jury was able to parse through the evidence and acquit Turner of the two robbery charges pertaining to C.B. and C.W. The acquittal of those charges also demonstrated that the jury was not influenced by the evidence relating to the other victims. *See State v. Stephens*, 2d Dist. Montgomery No. 17851, 2000 WL 569944, *5 (May 12, 2000) (finding that the jury's acquittal on one of the charged offenses indicated that the jury had been able to separate the evidence with respect to the different charges and that the jury was not "swayed" by the evidence pertaining to the other charges); *State v. Schiebel*, 55 Ohio St.3d 71, 88, 564 N.E.2d 54 (1990) (finding that defendant's claim that the jury was incapable of segregating the voluminous and complex evidence was "clearly rebutted" by the jury's verdict of acquittal on a portion of the charges); *United States v. Gallo*, 763 F.2d 1504, 1526 (6th Cir.1985) (finding that the jury's ability to acquit appellants on some counts and convict them on others "strongly suggests that the jury was not confused by the testimony adduced at trial, and was able to attribute to each appellant evidence pertinent to that particular party").

{¶ 39} Although Turner correctly argues that the State made some comments during its closing argument that implicitly asked the jury to consider the evidence as a whole as opposed to considering it separately as to each victim, we do not find that those comments impacted the outcome of trial so as to constitute plain error. The trial court properly instructed the jury that closing arguments were not to be considered evidence, and we must presume that the jury followed the trial court's instructions. *See State v.*

*Thrasher*, 2d Dist. Greene No. 2004-CA-113, 2006-Ohio-1260, ¶ 25. In addition, the evidence supporting Turner's offenses against each of the victims was strong given the presence of Turner's DNA in each case and the victims' resulting injuries. Given the strength of the evidence, it is unlikely that the jury's verdict would have been different absent the comments at issue.

**{¶ 40}** Because we find no plain error or abuse of discretion with regard to the trial court's decision that joinder of the charges was proper under the simple and direct test, it is unnecessary for us to analyze the stricter, more complex issue as to whether the evidence would have been admissible at separate trials as other acts evidence. *See State v. Johnson*, 88 Ohio St.3d 95, 109, 723 N.E.2d 1054 (2000) (if the state can meet the simple and direct test, it need not meet the stricter other acts test).

**{¶ 41}** Turner's first assignment of error is overruled.

### Second, Third, Fourth, Fifth, Sixth, and Seventh Assignments of Error

**{¶ 42}** Under his remaining six assignments of error, Turner claims that several of the offenses for which he was convicted were allied offenses of similar import that the trial court should have merged at sentencing. We will discuss each of Turner's merger claims separately following an overview of the allied offense analysis that is used to address such claims.

*Overview of Allied Offense Analysis*

**{¶ 43}** When a defendant's conduct supports multiple offenses, sentencing courts

apply the allied offense analysis in R.C. 2941.25 to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25 provides that:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 44} " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions * * *: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. " 'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *Id*.

{¶ 45} Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate

victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. Therefore, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 26.

{¶ 46} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "one offense was complete before the other offense occurred, * * * notwithstanding their proximity in time and that one [offense] was committed in order to commit the other." *State v. Turner*, 2d Dist. Montgomery No. 24421, 2011-Ohio-6714, ¶ 24. *Accord State v. Margiotti*, 10th Dist. Franklin No. 19AP-469, 2021-Ohio-1826, ¶ 15-16; *State v. Spurrier*, 11th Dist. Lake No. 2020-L-069, 2021-Ohio-1061, ¶ 68. In other words, "when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, 9 N.E.3d 443, ¶ 49 (2d Dist.).

{¶ 47} Whether offenses were committed with a separate animus within the meaning of R.C. 2941.25(B) concerns the defendant's " 'purpose' " or " 'immediate motive' " and " 'requires us to examine the defendant's mental state in determining whether two or more offenses may be chiseled from the same criminal conduct.' " *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 86, quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979). " 'Where an individual's immediate motive involves the commission of one offense, but in the course of committing that crime he must, A priori, commit another, then he may well possess but a single animus, and in that event may be convicted of only one crime.' " *State v. Ramey*, 2015-Ohio-5389, 55

N.E.3d 542, ¶ 70 (2d Dist.), quoting *Logan* at 131.

**{¶ 48}** "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Ruff,* 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, at ¶ 26. "A defendant bears the burden of establishing that offenses should be merged as allied offenses, and we review the trial court's merger ruling de novo." *State v. Farra*, 2d Dist. Montgomery No. 28950, 2022-Ohio-1421, ¶ 62, citing *State v. Frazier*, 2d Dist. Clark No. 2021-CA-46, 2021-Ohio-4155, ¶ 20.

**{¶ 49}** We note that Turner argues several times in his appellate brief that the State, through comments it made during closing argument, conceded that some of his offenses were allied offenses that merge. The State's closing argument, however, has no bearing on this court's allied offense analysis. As explained by the Seventh District Court of Appeals:

> Whether or not the prosecutor's theory of the case as articulated in its opening and closing remarks corresponds to the actual evidence presented is not under review when examining the record for allied offenses. Obviously, opening and closing statements are not evidence. "It is well settled that statements made by counsel in opening statements and closing arguments are not evidence." *State v. Frazier*, 73 Ohio St.3d 323, 338, 652 N.E.2d 1000 (1995). In reviewing a sentence for allied offenses, we normally look at the entire record and review the entire set of facts and circumstances as presented to the trier of fact. We do not

exclude particular properly admitted facts from our consideration simply because we believe the jury was paying more attention to the prosecutor's opening and closing remarks rather than the actual presentation of the evidence. The jury is free to match the facts presented at trial to the elements of the crime as stated in the indictment.

*State v. Helms*, 7th Dist. Mahoning No. 08 MA 199, 2012-Ohio-1147, ¶ 32; *State v. Gilbert*, 7th Dist. Mahoning No. 08 MA 206, 2012-Ohio-1165, ¶ 36.

**{¶ 50}** Although we agree that the State made remarks during its closing argument which suggested that certain offenses merged as allied offenses, we will nevertheless analyze each of Turner's merger claims using the entire set of facts and circumstances that was presented to the jury at trial.

### *Turner's Merger Claims*

**{¶ 51}** As previously discussed, Turner's last six assignments of error all raise merger claims relating to the various offenses for which he was convicted. Each of Turner's merger claims is discussed separately below. For the purpose of clarity, we will review Turner's claims/assignments of error out of order.

### Sixth Assignment of Error
### (Kidnapping Offenses Related to C.W.)

**{¶ 52}** Under his sixth assignment of error, Turner argues that the kidnapping

(felony or flight) and kidnapping (sexual activity) offenses pertaining to C.W. were allied offenses that should have merged.  We disagree.

{¶ 53} Kidnapping (felony or flight) in violation of R.C. 2905.01(A)(2) is committed when, by force, threat, or deception, one removes another from the place whether the other person is found or restrains the liberty of the other person "[t]o facilitate the commission of any felony or flight thereafter."  "Restraining an individual's liberty means limiting or restraining their freedom of movement."  (Citation omitted.)  *State v. Williams*, 2017-Ohio-5598, 93 N.E.3d 449, ¶ 19 (10th Dist.).  Removing an individual from the place where he or she is found means changing the individual's location.  Ohio Jury Instructions, CR Section 505.01(A) (Rev. Nov. 2023); *State v. Sanders*, 8th Dist. Cuyahoga No. 75398, 2000 WL 377505, *3-4 (Apr. 13, 2000).  The removal "need not be for any specific distance or duration of time or in any specific manner."  *Id*.

{¶ 54} Kidnapping (sexual activity) in violation of R.C. 2905.01(A)(4) is committed when, by force, threat, or deception, one removes another from the place whether the other person is found or restrains the liberty of the other person "[t]o engage in sexual activity * * * with the victim against the victim's will[.]"  "Sexual activity" includes "vaginal intercourse between a male and female." R.C. 2907.01(A)/(C).

{¶ 55} In this case, evidence presented at trial established that Turner committed kidnapping (sexual activity) when, with the intent to engage in sexual activity with C.W. against her will, Turner grabbed C.W. while she was walking in an alley and dragged her into an abandoned house where he eventually raped her through forced vaginal intercourse.  There was also evidence establishing that Turner committed kidnapping

(felony or flight) after the rape when he struck C.W. on the back of the head and rendered her unconscious so that he could flee the scene.

{¶ 56} We find that Turner's act of hitting C.W. on the head and rendering her unconscious constituted a restraint of C.W.'s liberty by force as required for kidnapping because " '[a] person's liberty is restrained when the offender limits the victim's freedom of movement *in any fashion for any period of time.' "  (Emphasis added.)  *State v. Honzu*, 11th Dist. Trumbull No. 2022-T-0122, 2023-Ohio-2831, ¶ 37, quoting *State v. Totarella*, 11th Dist. Lake No. 2009-L-064, 2010-Ohio-1159, ¶ 118; *Cleveland v. Watson*, 8th Dist. Cuyahoga No. 108746, 2020-Ohio-3284, ¶ 42.   "[T]he element of restraint does not depend on 'the manner a victim is restrained.   Rather, it depends on whether the * * * restraint is such as to place the victim in the offender's power and beyond immediate help, even though temporarily. * * * [Thus], the restraint involved need not be actual confinement, but may be merely compelling the victim to stay where [she] is.' "  *Honzu* at ¶ 37, quoting Committee Comments to R.C. 2905.01.   (Other citations omitted.).   For example, the Twelfth District Court of Appeals found that a reasonable juror could conclude that a victim's liberty was restrained by force where the victim was "stabbed in the neck from behind and did not have control when she fell onto the bed."  *State v. Cottrell*, 12th Dist. Fayette No. CA2022-11-014, 2023-Ohio-3932, ¶ 29.

{¶ 57} In this case, C.W. testified that she blacked out when Turner hit her on the back of the head and that, when she regained consciousness, she observed Turner driving away.   This indicated that Turner restrained C.W.'s liberty in such a manner to facilitate his flight from the abandoned house after the commission of the rape offense.

Accordingly, C.W.'s testimony supported finding that Turner had committed kidnapping (felony or flight) separately from kidnapping (sexual activity). As previously discussed, the sexual activity kidnapping was committed by Turner's dragging C.W. into the abandoned house with the requisite intent to engage in sexual activity with her against her will. Because there was evidence establishing that Turner had completed the offense of kidnapping (sexual activity) before he committed kidnapping (felony or flight), the offenses were committed separately and did not merge.

{¶ 58} Turner's sixth assignment of error is overruled.

Seventh Assignment of Error
(Rape and Kidnapping Offenses Related to C.W.)

{¶ 59} Under his seventh assignment of error, Turner claims that the rape offense pertaining to C.W. should have merged with the kidnapping (sexual activity) and kidnapping (felony or flight) offenses. We disagree.

{¶ 60} The conduct necessary to commit kidnapping (sexual activity) and kidnapping (felony or flight) has already been discussed under the previous assignment of error. Rape in violation of R.C. 2907.02(A)(2) is committed when one engages in sexual conduct with another by purposefully compelling the other person to submit by force or threat of force. Like "sexual activity," "sexual conduct" includes "vaginal intercourse between a male and female." R.C. 2907.01(A).

{¶ 61} It is well established that "[a]ll rapes inherently involve a restraint on the liberty of another, and where the act of rape is the sole unlawful exercise of restraint on the physical liberty of another person, the law is clear that any accompanying kidnapping

charge should merge with the rape charge." *State v. Portman*, 2d Dist. Clark No. 2013-CA-68, 2014-Ohio-4343, ¶ 32, citing *Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345. Therefore, "[w]here the restraint or movement of the victim is merely incidental to a separate underlying crime [such as rape], there exists no separate animus sufficient to sustain separate convictions[.]" *Logan* at paragraph (a) of the syllabus.

**{¶ 62}** As an exception to this rule, the Supreme Court in *Logan* explained that a separate animus does exist and offenses do not merge if (1): "the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," or (2) "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime[.]" *Id*. at paragraphs (a) and (b) of the syllabus.

**{¶ 63}** "Although *Logan* predates *Ruff*, the *Logan* guidelines are still relevant to determining whether rape and kidnapping convictions merge." (Citations omitted.) *State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 108. "The guidelines in *Logan* are also reasonable considerations for determining whether the defendant committed kidnapping as separate conduct from other offenses." *State v. Cargle*, 2d Dist. Montgomery No. 28044, 2019-Ohio-1544, ¶ 46, citing *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 13, citing *State v. Ware*, 63 Ohio St.2d 84, 406 N.E.2d 1112 (1980).

**{¶ 64}** As previously discussed, there was evidence presented at trial establishing that Turner committed kidnapping (sexual activity) when, with intent to engage in sexual activity with C.W. against her will, he grabbed C.W. while she was walking in an alley and

dragged her into an abandoned house where he raped her. Several courts, including this one, have applied the *Logan* guidelines to similar factual scenarios and found that the kidnapping and rape offenses did not merge because they were committed by separate conduct and with a separate animus. *See, e.g., State v. O'Connor*, 2d Dist. Montgomery No. 28259, 2020-Ohio-4402, ¶ 28 (holding that kidnapping and rape offenses were committed with a separate animus and were not subject to merger where the appellant ran outside, dragged the victim back into an apartment, barricaded the door in an effort to keep the victim from running away again, and then took the victim to the back bedroom where he raped her); *State v. DeWees*, 2018-Ohio-1677, 111 N.E.3d 334, ¶ 40 (11th Dist.) (holding that kidnapping and rape offenses were committed by separate conduct and with a separate animus where the defendant forcibly dragged the victim "by the hair and neck, from a public walkway where she was found to a place not visible from that walkway for the purpose of raping her without detection[,]" as "the act of dragging [the victim] by the hair and neck neither directly facilitated nor was immediately motivated by the desire to commit the rape"); *State v. Terry*, 10th Dist. Franklin No. 15AP-176, 2015-Ohio-3847, ¶ 16-17 (holding that kidnapping and rape offenses were committed by separate conduct and with a separate animus where the victim was dragged around the corner from her residence and forced into a dark, open garage where she was raped because "the movement of the victim prior to the rape although not long in duration, was sufficient to constitute conduct separate from the commission of the rape* * * and was not merely incidental to the rape"); *State v. Zanders*, 8th Dist. Cuyahoga No. 99146, 2013-Ohio-3619, ¶ 29 (holding that "dragg[ing] the victim by the back of her hair from a pay

phone across the street and then through an open field to a secluded 'cubbyhole' in the rear yard behind a building" involved "restraint and movement [that] was not incidental to the rape[,]" as the "force used to drag the victim to the secluded location was separate and distinct from the force exercised during acts of the rape"); *State v. Singh*, 12th Dist. Butler No. CA2021-12-158, 2022-Ohio-3385, ¶ 79 (holding that there was a separate animus for rape and kidnapping offenses because the appellant's movement of the victim from one neighborhood to another and his secretive concealment of the victim in an abandoned building had significance apart from the rape).

{¶ 65} We agree with the aforementioned cases and find that, when applying the guidelines in *Logan* to the facts of the present case, Turner's conduct of dragging C.W. from the alley to the abandoned house constituted separate conduct from the rape. We reach this conclusion because the evidence presented at trial established that the movement of C.W. was substantial, as Turner moved her from the alley, through a garage, and into the house all while C.W. was struggling to get away. In addition, dragging C.W. into the abandoned house did not directly facilitate the rape offense. That is, it was not physically necessary for Turner to drag C.W. into the abandoned house in order to commit the rape, as the rape could have been completed in the alley where he found her. Turner's act of dragging C.W. into the abandoned house was also committed with a separate animus because the purpose/immediate motive in doing so was to get C.W. in a location that was not visible to the public, not to physically carry out the rape itself. Because Turner committed the rape and kidnapping (sexual activity) offenses through separate conduct and with a separate animus, those offenses did not merge.

{¶ 66} As for whether the rape and kidnapping (felony or flight) offenses merged, we previously found that there was evidence establishing that Turner committed kidnapping (felony or flight) after the rape had already been completed, i.e., when Turner fled the scene after hitting C.W. on the head and rendering her unconscious. Because Turner engaged in that conduct after the rape, the two offenses were committed by separate conduct and did not merge.

{¶ 67} Turner's seventh assignment of error is overruled.


Assignment of Error No. 5
(Abduction Offenses Related to H.C.)

{¶ 68} Under his fifth assignment of error, Turner argues that the abduction (restrain) and abduction (restrain/sexual motivation) offenses pertaining to H.C. were allied offenses that should have merged because they were based on the same conduct. We again disagree.

{¶ 69} Abduction (restrain) in violation of R.C. 2905.02(A)(2) is committed when, without privilege to do so, one knowingly restrains the liberty of another person by force or threat under circumstances that create a risk of physical harm to the victim or place the victim in fear. As previously discussed, "[r]estraining an individual's liberty means limiting or restraining their freedom of movement. The restraint need not be for any specific duration or in any specific manner." (Citation omitted.) *Williams*, 2017-Ohio-5598, 93 N.E.3d 449, at ¶ 19. "Even * * * 'momentary' restraint may qualify as [a]bduction, if it produces the required risk of physical harm to, or fear in, the victim.' " *State v. Saylor*, 2d Dist. Champaign No. 1994-CA-10, 1995 WL 276103, *9 (May 12,

1995), quoting *State v. Messineo*, 4th Dist. Athens Nos. 1488 and 1493, 1993 WL 3520, *6 (Jan. 6, 1993).

{¶ 70} Abduction (restrain/sexual motivation) in violation of R.C. 2905.02(B) is committed when one commits abduction under R.C. 2905.02(A) "with a sexual motivation." R.C. 2905.02(B). "Sexual motivation" is defined as "a purpose to gratify the sexual needs or desires of the offender." R.C. 2971.01(J).

{¶ 71} In this case, evidence presented at trial established that Turner committed abduction (restrain/sexual motivation) by grabbing H.C. and dragging her down the stairs of the abandoned house. The evidence established that this conduct was performed with the purpose to gratify Turner's sexual needs or desires, as H.C. testified that Turner raped her after he dragged her down the stairs.

{¶ 72} As for the abduction (restrain) offense, H.C. testified that, after the rape, she wrestled with Turner on the stairs and Turner picked her up and body-slammed her to the floor, injuring her back. The body-slamming and the injury to H.C.'s back supported the felonious assault charge, which was not challenged on appeal. However, H.C. also testified that after being body-slammed, Turner got on top of her and punched her several times until he stopped to find his car keys. We find that Turner's getting on top of H.C. and punching her several times after raping and body-slamming her qualified as a separate restraint of C.W.'s liberty by force that placed C.W. in fear and created a risk of physical harm. Accordingly, the evidence presented at trial supported finding that Turner had committed abduction (restrain) by separate conduct. Because the abduction (restrain) offense and the abduction (restrain/sexual motivation) offense were committed

by separate conduct, they were not allied offenses that merged.

**{¶ 73}** Turner's fifth assignment of error is overruled.

Assignment of Error No. 3
(Kidnapping and Abduction Offenses Related to C.B.)

**{¶ 74}** Under his third assignment of error, Turner argues that the kidnapping (sexual activity), abduction (restrain/sexual motivation), and kidnapping (felony or flight) offenses pertaining to C.B. were allied offenses that should have merged. We disagree.

**{¶ 75}** Upon review, we find that there was evidence presented at trial establishing that the aforementioned offenses were committed separately. First, the evidence established that Turner committed kidnapping (sexual activity) when, with intent to engage in sexual activity with C.B. against her will, he lured C.B. into his vehicle through deception by telling her that he would drive her to a gas station, but instead drove her to a secluded parking lot where he raped her. Therefore, the kidnapping (sexual activity) offense was completed once Turner, with the requisite intent, used deception to move C.B. from where she was walking on North Main Street to the secluded parking lot where he eventually raped her.

**{¶ 76}** There was also evidence establishing that Turner committed abduction (restrain/sexual motivation) when he restrained C.B.'s liberty by physically attacking her and punching her in the face while they were standing in the parking lot. C.B. testified that she and Turner began to physically struggle with each other because Turner was trying to force her to have sexual intercourse with him. C.B. testified that Turner took off her shorts, bent her over the passenger seat of his vehicle, and inserted his penis

into her vagina. Therefore, the abduction (restrain/sexual motivation) offense was completed once Turner used the aforementioned force to restrain C.B.'s liberty to gratify his sexual needs or desires in a manner that created a risk of physical harm to C.B.

{¶ 77} The evidence further established that Turner committed kidnapping (felony or flight) after he finished raping C.B. C.B. testified that, after the rape, "[Turner] threw me, like -- very much like, threw me away from the car and drove off and left me." Trial Tr. Vol. IV, p. 329. This conduct constituted a forceful restraint of C.B.'s liberty and/or a forceful removal of C.B. from where she was located. Therefore, Turner completed the kidnapping (felony or flight) offense when he used force to restrain/remove C.B. from where he had raped her on the passenger seat of his vehicle to the parking lot so that he could drive off and flee the scene while C.B. was half-naked and stranded without her cell phone.

{¶ 78} Based on the foregoing analysis, we find that the kidnapping (sexual activity), abduction (restrain/sexual motivation), and kidnapping (felony or flight) offenses pertaining to C.B. were committed separately. Therefore, those offenses were not allied offenses that merged.

{¶ 79} Turner's third assignment of error is overruled.


Assignment of Error No. 2
(Rape and Abduction Offenses Related to C.B.)

{¶ 80} Under his second assignment of error, Turner argues that the rape offense pertaining to C.B. should have merged with abduction (restrain/sexual motivation). After carefully reviewing the record, we disagree with Turner.

**{¶ 81}** As previously discussed, abduction (restrain/sexual motivation) in violation of R.C. 2905.02(B) is committed when one, "with a sexual motivation," knowingly restrains the liberty of another person by force or threat under circumstances that create a risk of physical harm to the victim or place the victim in fear. Rape in violation of R.C. 2907.02(A)(2) is committed when one engages in sexual conduct with another by purposefully compelling the other person to submit by force or threat of force.

**{¶ 82}** "[W]hen the abduction of the victim is incidental to the underlying sexual crime, and is undifferentiated by time, place or circumstance, those offenses merge." *State v. Dennison*, 9th Dist. Summit No. 29354, 2020-Ohio-2699, ¶ 34, citing *State v. Patel*, 2d Dist. Greene No. 2010-CA-77, 2011-Ohio-6329, ¶ 88-93. (Other citations omitted.) To the extent that they apply, the guidelines in *Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345, can be used to determine whether abduction has a separate animus from an underlying offense. *See, e.g., State v. Monroe*, 4th Dist. Scioto No. 05CA3042, 2007-Ohio-1492, ¶ 44-48; *State v. Merz*, 1st Dist. Hamilton No. C-200152, 2021-Ohio-2093, ¶ 14. Again, the *Logan* guidelines provide that a separate animus for each offense exists where: (1) "the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense," or (2) "the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime[.]" *Logan* at paragraphs (a) and (b) of the syllabus.

**{¶ 83}** In *State v. Powih*, 2017-Ohio-7208, 97 N.E.3d 1 (12th Dist.), the Twelfth District Court of Appeals held that abduction was incidental to and merged with rape

where the defendant "entered the room * * *, locked the door, grabbed [the victim's] arm, spun her around, spanked her clothed buttocks, yanked her pants and underwear down before spanking her bare buttocks, and inserted his fingers into her vagina." *Id.* at ¶ 40- 43. In so holding, the court found that appellant's restraint of the victim "was part of a single course of conduct" and that "the restraint and sexual acts were undifferentiated by time, place, or circumstance." *Id.* at ¶ 40. The court also found that the appellant had acted with the same animus because he "restrained [the victim's] liberty to facilitate his purpose of digitally raping [the victim] and touching [her] buttocks." *Id.* at ¶ 41. The court further held that the offenses were of similar import because "the harm that resulted from the abduction offense was not separate an identifiable from the harm that resulted from the rape[.]" *Id.* at ¶ 42.

{¶ 84} Similarly, in *Patel*, 2d Dist. Greene No. 2010-CA-77, 2011-Ohio-6329, this court held that abduction, rape, and gross sexual imposition offenses should have merged where the appellant entered the bathroom, locked the door, placed a hand down the back of the victim's pants, and inserted a finger inside the victim's vagina. *Id.* at ¶ 88-93. Although *Patel* was decided before *Ruff*, we nevertheless find it instructive. In *Patel*, we explained that the appellant acted with the same animus for each offense because his "immediate intent was to commit the sex offenses," as the appellant "committed abduction by restraining [the victim's] liberty solely to facilitate the sex acts that he intended to perform." *Id.* at ¶ 89. We also found that the appellant's "restraint of [the victim] in the bathroom was incidental to [appellant's] commission of the sex offenses and had no independent significance." *Id.* at ¶ 88. Accordingly, we concluded that "the restraint

and the sexual acts were undifferentiated by time, place, or circumstance." *Id.*

{¶ 85} Upon review, we find that the aforementioned cases are distinguishable from the present case because there was evidence establishing that the instant abduction and rape offenses were committed with dissimilar import in that the abduction resulted in separate, identifiable physical harm. As previously discussed, Turner abducted C.B. with sexual motivation when he physically struggled with C.B. in the parking lot prior to raping her. After carefully reviewing the record, we find that Turner's restraint of C.B. during the physical struggle had a significance apart from the rape because there was evidence that, during the physical struggle, Turner stomped on C.B.'s chest, leaving a bruise, and punched C.B.'s face, breaking her nose and causing her temporarily to black out. Accordingly, Turner's conduct during the physical struggle subjected C.B. to physical harm that was separate from the physical harm occasioned by the rape itself. These differentiating circumstances were sufficient to support separate convictions for abduction and rape. Therefore, the abduction (restrain/sexual motivation) and rape offenses pertaining to C.B. were not allied offenses that merged.

{¶ 86} Turner's second assignment of error is overruled.

Assignment of Error No. 4
(Assault and Abduction Offenses Related to C.T.)

{¶ 87} Under his fourth assignment of error, Turner argues that the assault and abduction (restrain/sexual motivation) offenses pertaining to C.T. should have merged. We once again disagree with Turner.

{¶ 88} As previously discussed, abduction (restrain/sexual motivation) in violation

of R.C. 2905.02(B) is committed when one, "with a sexual motivation," knowingly restrains the liberty of another person by force or threat under circumstances that create a risk of physical harm to the victim or place the victim in fear. Again "sexual motivation" is defined as "a purpose to gratify the sexual needs or desires of the offender." R.C. 2971.01(J).

{¶ 89} Assault in violation of R.C. 2903.13(A) is committed when one knowingly causes or attempts to cause physical harm to another. "Physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). " '[W]hen accompanied by the requisite intent, a " * * * shove, push or grab * * * " may satisfy the "physical harm" element of assault.' " *State v. Williams*, 10th Dist. Franklin No. 01AP-254, 2001 WL 1661862, *5 (Dec. 31, 2001), quoting *In re Mark M.*, 6th Dist. Erie Nos. 99-028 and 99-046, 2000 WL 125800, *2 (Feb. 4, 2000), quoting *State v. Weber*, 6th Dist. Huron No. H-98-005, 1998 WL 700676, *2 (Oct. 9, 1998). *Accord State v. Lillie*, 5th Dist. Tuscarawas No. 2017AP100028, 2018-Ohio-2714, ¶ 12. A visible injury "is not required to prove assault because a mere attempt to cause physical harm is sufficient to complete the offense." *State v. Baker*, 2d Dist. Montgomery No. 22136, 2008-Ohio-3000, ¶ 32. However, the attempt to cause physical harm must be made knowingly.

{¶ 90} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). "Accordingly, assault does not

require that a defendant intend to cause physical harm, but 'only requires that the defendant acted with awareness that the conduct probably will cause such harm.' " *State v. Lucas*, 11th Dist. Lake No. 2020-L-118, 2021-Ohio-2721, ¶ 19, quoting *State v. Skjold*, 11th Dist. Geauga No. 2003-G-2544, 2004-Ohio-5311, ¶ 24. *Accord State v. Pierce*, 2023-Ohio-528, 209 N.E.3d 221, ¶ 24 (8th Dist.), citing *State v. Lloyd*, 8th Dist. Cuyahoga No. 109128, 2021-Ohio-1808, ¶ 51 (it is only necessary that the result is within the natural and logical scope of risk created by the conduct).

{¶ 91} In this case, there was evidence presented at trial establishing that Turner committed assault when he pushed C.T. out of his vehicle after he raped her. Although Turner likely pushed C.T. out of the vehicle simply to facilitate his leaving the scene, the actual purpose behind his conduct was immaterial. What matters was that some kind of physical harm would be a natural, logical risk of pushing someone out of a vehicle, and that a person engaging in such conduct would be aware of such a risk. Accordingly, Turner's conduct would satisfy the knowing element of assault.

{¶ 92} Because assault can be committed by a mere attempt to cause physical harm, it is also immaterial that there was no evidence indicating that C.T. was physically injured by Turner's conduct of pushing her out of his vehicle. As previously noted, " 'when accompanied by the requisite intent, a " * * * shove, push or grab * * * " may satisfy the "physical harm" element of assault.' " *Williams* at *5, quoting *Mark M.* at *2, quoting *Weber* at *2. Because we have already determined that Turner would have been aware that the nature of his conduct would probably cause some kind of physical harm to C.T., we find that all elements of assault were satisfied, i.e., that Turner knowingly attempted

to cause physical harm to C.T. when he pushed her out of his vehicle after raping her.

**{¶ 93}** There was also evidence presented at trial establishing that Turner committed abduction (restrain/sexual motivation) when he parked his vehicle behind the abandoned house at West Grand Avenue and punched C.T. in the face multiple times after she refused to perform fellatio on him. Accordingly, Turner committed the abduction offense separately from the assault, as the abduction had already been completed when the assault was committed. Because of this, the assault and abduction offenses were not allied offenses that merged.

**{¶ 94}** Turner's fourth assignment of error is overruled.

## Conclusion

**{¶ 95}** Having overruled all of Turner's assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.