[Cite as *State v. Lucas*, 2021-Ohio-2721.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## LAKE COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- v -

DALE C. LUCAS,

        Defendant-Appellant.

CASE NO. 2020-L-118

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2020 CR 000181

## O P I N I O N

Decided: August 9, 2021
Judgment: Affirmed

*Charles E. Coulson*, Lake County Prosecutor, and *Kristi L. Winner*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Allison S. Breneman*, P.O. Box 829, Willoughby, OH 44096 (For Defendant-Appellant).

MATT LYNCH, J.

{¶1} Defendant-appellant, Dale C. Lucas, appeals his conviction for assault following a jury trial in the Lake County Court of Common Pleas. For the following reasons, the assault conviction is affirmed.

{¶2} On July 10, 2020, the Lake County Grand Jury returned an Indictment against Lucas charging him with assault (Count 1), a felony of the fifth degree in violation of R.C. 2903.13(A) and (C)(4)(a), and obstructing official business (Count 2), a felony of the fifth degree in violation of R.C. 2921.31.

{¶3} The matter proceeded to a jury trial on October 13 and 14, 2020. The jury returned a verdict of "guilty" as to assault and "not guilty" as to obstructing official business. The following testimony was presented at trial relative to the assault count:

{¶4} Brian Serra, a corrections officer at the Lake County Adult Detention Facility, testified that, at about 11:15 on the evening of January 28, 2020, he was directed to the second floor of the facility where there was water in the hallway. Serra observed Lucas, in an isolation cell, approximately four by six feet, scooping water out of the toilet and throwing it on the floor. The supervising officer, Lieutenant Simpson, ordered Lucas to be handcuffed and placed in a restraint chair. Serra, Simpson, and another corrections officer, Officer Karac, entered the cell and Lucas was ordered to place his hands on the wall. Lucas did not comply. Officer Karac approached Lucas and he began to struggle. The officers took Lucas down on the bunk.

{¶5} Officer Serra testified: "That was when Officer Karac and me were struggling to restrain his arms. I was trying to restrain his legs, and that's when he kicked Lieutenant Simpson, who was directly on my left hip. * * * He was struggling, didn't want to be restrained. * * * I was attempting to restrain his legs and that's when his legs slipped out of my hand." Serra was uncertain if the kick was intentional.

{¶6} Keith Parsons, a corrections officer at the Lake County Adult Detention Facility, was present in the second-floor isolation unit on the evening in question. He remained outside Lucas' cell during the struggle to subdue him. He noted that Lieutenant Simpson was "limping badly" when he emerged from the cell.

{¶7} Davor Karac, a corrections officer at the Lake County Adult Detention Facility, testified that on the evening in question he was directed to the second-floor

2

isolation unit and observed Lucas repeatedly flushing the toilet and scooping the water out onto the floor. Lucas' demeanor was angry, and he was yelling threats through the door at the officers. Lieutenant Simpson ordered Karac into the cell and Lucas adopted a combative stance "with his right foot in front, hands raised in a fighting manner." The officers "gained compliance of inmate Lucas," forcing him face down on his bunk.

{¶8} Officer Karac described the situation thus: "He was still struggling and would not give up his arms. * * * At that point Lieutenant Simpson pepper sprayed Lucas. * * * At that point I heard Lieutenant Simpson scream, 'my leg.'"

{¶9} Robert Niemi, a corrections officer at the Lake County Adult Detention Facility, was present in Lucas' cell on the evening in question. He described the struggle to restrain Lucas as follows: "Officers Karac and Serra grabbed ahold of the defendant and placed him against the wall in order for him to be handcuffed. At that point the defendant pushed off of the wall toward the officers who had come into the room. At that point we grabbed ahold of him and took him down on his bunk just to prevent any officer injury. * * * [After] maybe a minute of struggling with him on his bunk, Lieutenant Simpson pepper sprayed him and from that point he gave up and let us have his hands, let us have his feet, and he was handcuffed and shackled." Niemi was not aware of any injury suffered by Lieutenant Simpson during the struggle.

{¶10} Scott Simpson, an executive lieutenant at the Lake County Adult Detention Facility, was the officer in charge of the facility on the evening in question. He was called to the second floor on account of Lucas having flooded his cell. He ordered Lucas restrained and followed Officers Serra, Karac, and Niemi into the cell which he described as about four by eight feet.

3

{¶11} Lieutenant Simpson testified: "The officers went in. [Lucas] started resisting the officers with the handcuffing. The officers took him down onto the bunk * * * [and] were trying to handcuff him. * * * My job as a supervisor is to make sure * * * they are not abusing the inmate while we're doing it. * * * I have people on his legs, people up top trying to get him. He kicked off of the bunk into my knee, folded my knee. * * * I think he caught me off guard. * * * My position was I should have stayed back a little more, but it's a small area. * * * I think he just had that one hard kick come off the side. It wasn't like his legs were flailing in the air."

{¶12} Lieutenant Simpson was questioned about the sequence of events. It was noted that, in the Response to Aggression Report completed by Simpson, he described deploying the pepper foam spray "while being kicked in the right knee." Simpson explained that he was kicked first and then, as a result of the injury, deployed the pepper spray: "No, I was kicked first and then after being kicked I realized that the situation became -- because I realized I was injured, that I needed to end it right there, that's why the pepper spray was used. * * * The pepper spray wasn't used right when he kicked me. * * * I realized now I'm already injured, I don't want him getting injured, I don't want the officers injured, then I deployed the pepper spray."

{¶13} On November 23, 2020, the trial court issued its Judgment Entry of Sentence. The court ordered Lucas to serve a stated prison term of twelve months for assault, consecutive to another twelve-month sentence imposed for violating post-release control.

{¶14} On November 30, 2020, Lucas filed a Notice of Appeal. On appeal, he raises the following assignments of error:

4

{¶15} "[1.] The Jury found, against the manifest weight of the evidence, that the Appellant committed the acts alleged in the indictment."

{¶16} "[2.] The evidence was not legally sufficient to sustain a guilty verdict."

{¶17} The evidentiary basis for a criminal conviction may be challenged on appeal on the grounds of the sufficiency and the weight of the evidence. "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), paragraph two of the syllabus.

> With respect to sufficiency of the evidence, "'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Black's Law Dictionary (6 Ed.1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

*Id.* at 386-387.

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

5

Case No. 2020-L-118

Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *Robinson, supra*, 162 Ohio St. at 487, 55 O.O. at 388-389, 124 N.E.2d at 149. Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*." (Emphasis added.) Black's, *supra*, at 1594.

*Thompkins* at 387.

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs*, 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720-721 ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").

*Id.*; *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25 ("a reviewing court asks whose evidence is more persuasive—the state's or the defendant's?").

{¶18} Although distinct legal concepts, this court and others have recognized that, "[s]ince there must be sufficient evidence to take a case to the jury, it follows that 'a finding that a conviction is supported by the *weight* of the evidence necessarily must include a finding of sufficiency.'" (Citation omitted.) *State v. Owens*, 2018-Ohio-1334, 109 N.E.3d 588, ¶ 26 (11th Dist.); *State v. Gibson*, 11th Dist. Lake No. 2020-L-073, 2021-Ohio-1255,

6

¶ 12 ("[u]pon a conclusion that the trial court's decision is not against the manifest weight of the evidence, an appeals court need not do a separate analysis as to sufficiency because a conclusion that a decision is not against the manifest weight necessarily means it was supported by sufficient evidence"); *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) ("[a] reversal based on the weight of the evidence * * * can occur only after the State both has presented *sufficient evidence* to support conviction and has persuaded the jury to convict").

{¶19} In order to convict Lucas of assault, the State was required to prove beyond a reasonable doubt that he did "knowingly cause or attempt to cause physical harm to another." R.C. 2903.13(A). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." R.C. 2901.22(B). Accordingly, assault does not require that a defendant intend to cause physical harm, but "only requires that the defendant acted with awareness that the conduct probably will cause such harm." *State v. Skjold*, 11th Dist. Geauga No. 2003-G-2544, 2004-Ohio-5311, ¶ 24[1]; *State v. Lloyd*, 8th Dist. Cuyahoga No. 109128, 2021-Ohio-1808, ¶ 51 ("[t]o be actionable it is only necessary that the result is within the natural and logical scope of risk created by the conduct") (citation omitted).

{¶20} With respect to sufficiency, Lucas argues that there was no evidence that he acted knowingly when he kicked Lieutenant Simpson. He claims the uncontradicted

---

1. The *Skjold* case, like many of the other cases which follow, involved felonious assault rather than assault. The only difference between felonious assault and assault is that the former requires *serious* physical harm. R.C. 2903.11(A). With respect to the mens rea or culpability element, both crimes require the offender to act "knowingly." As to this element, then, felonious assault cases are equally applicable to assault cases.

7

Case No. 2020-L-118

evidence is that, at the time of the alleged assault, corrections officers were trying to restrain him and hold him down on the bunk. "At this point, Mr. Lucas was not fully in control of his own body" and could not "have had any knowledge where his foot would have landed[;] [i]t was just as likely that his foot would have kicked an object in the room, or the air." Appellant's brief at 9.

{¶21} Before considering Lucas' argument, the following statement of the law is worth quoting:

> "Incidental and accidental conduct cannot support a conviction for knowingly causing or attempting to cause physical harm." *In re S.C.W.*, 9th Dist. Summit No. 25421, 2011-Ohio-3193, ¶ 23. However, several Ohio courts have found that 'flailing' to evade arrest is sufficient to support a conviction for knowingly causing harm or attempting to cause harm. *See, e.g., State v. Munoz*, 10th Dist. Franklin No. 12AP-299, 2013-Ohio-4987, ¶ 12 ("When flailing one's arms while in close proximity to another, it is probable that one will strike the other."); *State v. Standifer*, 12th Dist. Warren No. CA2011-07-071, 2012-Ohio-3132 (evidence that officer was kicked by defendant's flailing foot during arrest was sufficient to support assault conviction); *State v. Noble*, 9th Dist. Lorain No. 94CA005862, 1995 WL 366069 (June 21, 1995) (evidence that officer was struck by defendant's flailing arms and legs during arrest was sufficient to support assault conviction).

*In re M.H.*, 2021-Ohio-1041, 169 N.E.3d 971, ¶ 44 (1st Dist.); *State v. Fort*, 2016-Ohio-1242, 61 N.E.3d 864, ¶ 27 (10th Dist.); *State v. Jones*, 8th Dist. Cuyahoga No. 81112, 2003-Ohio-3004, ¶ 57.

{¶22} We find that the evidence is sufficient to support a conviction for assault: Lucas delivered a hard kick while four corrections officers attempted to subdue him in a confined area. A photograph of Lucas' cell depicts the bunk flush against the cell wall. The officers could have only been positioned on one side of the bunk and the kick could only have been directed toward the officers. It was entirely probable that the kick would

8

have impacted one of the officers and cause some physical injury. Regardless of whether Lucas was "fully in control of his own body," he at least had enough control of his legs to kick. Moreover, there is evidence that the kick was not even a blind kick. If Lieutenant Simpson was in a position to pepper spray Lucas' face, Lucas was in a position that he could see Lieutenant Simpson.

{¶23} Lucas' argument rests on the supposition that he had been pepper sprayed before delivering the kick thus rendering it an involuntary reaction. The evidence for this is not uncontradicted and, therefore, this argument goes to the weight rather than the sufficiency of the evidence.

{¶24} Lucas notes that Officer Karac testified that Lieutenant Simpson pepper sprayed him and then cried out, "my leg," and that, according to Simpson's written report, he pepper sprayed Lucas "while being kicked in the right knee." Although this evidence supports an inference that the kick was an involuntary action, it does not conclusively establish the fact. Contrary to this evidence is the express testimony of Simpson that he was kicked first and that this prompted him to deploy the pepper spray. Simpson explained the use of the word "while" in the written report as referring to the "whole moment" in which the events occurred. In addition to this direct evidence that Lucas kicked before being pepper sprayed, Officer Niemi testified that Lucas ceased resisting after being pepper sprayed which indirectly supports Simpson's testimony. Similarly, Officer Serra testified that Simpson was kicked while he was attempting to restrain him, i.e., before the pepper spray was deployed. Considering this conflicting testimony, we find no manifest injustice in the jury's decision to convict.

{¶25} The fact that Officer Serra could not say whether the kick was intentional

9

and that the other officers were silent about Lucas' intentions is of minimal import. In this case and as is common in such cases, there was no direct evidence regarding the defendant's intentions. "Absent an admission, whether a defendant acted 'knowingly' must be determined 'from all the surrounding facts and circumstances, including the doing of the act itself.'" (Citation omitted.) *Lloyd*, 2021-Ohio-1808, at ¶ 51.

{¶26} Finally, even assuming that Lucas was pepper sprayed before kicking, the possibility of an intentional kick is not precluded. Under this assumption, it would be possible to infer that the action was involuntary, but it would be equally possible to infer that Lucas intentionally kicked blindly in retaliation or as an act of further resistance. Lieutenant Simpson described "one hard kick" rather than Lucas' legs "flailing in the air." As noted above, given the circumstances in the cell, even a blind kick would be likely to cause harm. If so, the conviction would still be sustained.

{¶27} The assignments of error are without merit.

{¶28} For the foregoing reasons, Lucas' conviction for assault is affirmed. Costs to be taxed against the appellant.


MARY JANE TRAPP, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.

10

Case No. 2020-L-118