[Cite as *State v. Carter*, 2024-Ohio-5031.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                      Court of Appeals No.  L-23-1130

    Appellee                                   Trial Court No.  CR0202201827

v.

Jadiah Carter                                      **DECISION AND JUDGMENT**

    Appellant                                  Decided:  October 18, 2024

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**SULEK, P.J.**

{¶ 1} Appellant, Jadiah Carter, appeals from the April 27, 2023 judgment of the

Lucas County Court of Common Pleas convicting him of one count of aggravated

murder, one count of attempted murder, one count of murder, and two counts of felonious

assault, with firearm specifications on each of the above counts, as well as one count of

discharge of a firearm on or near prohibited premises.  Carter raises a single assignment

of error challenging his conviction as against the manifest weight of the evidence. For the reasons that follow, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} On May 19, 2022, the Lucas County Grand Jury indicted Carter on one count of aggravated murder in violation of R.C. 2903.01(C) and (G), an unclassified offense (count 1); one count of attempt to commit murder in violation of R.C. 2923.02 and 2903.02(A), a first-degree felony (count 2); one count of murder in violation of R.C. 2903.02(B) and 2929.02, an unclassified offense (count 3); two counts of felonious assault in violation of R.C. 2903.11(A)(2) and (D), a second-degree felony (counts 4 and 5); and one count of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) and (C)(4), a first-degree felony (count 6). Counts 1, 2, 3, 4, and 5 each had the following two firearm specifications: discharge of a firearm from a motor vehicle under R.C. 2941.146(A), (B), and (D); and displaying, brandishing, indicating possession of, or using a firearm under R.C. 2941.145(A), (B), (C), and (F).

{¶ 3} The charges stemmed from an apparent road-rage incident between Carter and J.H. that resulted in the death of J.H.'s seven-month-old baby. On April 27, 2022, J.H. was tailgating Carter as they both drove westbound on Hillcrest Avenue in Toledo. After the two vehicles reached the intersection of Hillcrest and Jackman, Carter fired multiple gunshots at J.H.'s vehicle, hitting J.H.'s baby, who was in her car seat in the back of J.H.'s vehicle, as well as grazing J.H.'s back.

2.

{¶ 4} Carter pleaded not guilty to the charges, and he filed a notice of self-defense. At the jury trial, which spanned three days, the state presented the testimony of several witnesses, including J.H. and members of the Toledo Police Department. Carter testified on his own behalf, asserting that he acted in self-defense. The testimony and evidence presented at trial relating to Carter's claim of self-defense is summarized below.

### J.H.'s Testimony

{¶ 5} On April 27, 2022, J.H. left his mother's house with his seven-month-old daughter, D.H., to go to a friend's house. After leaving his friend's house, J.H., who was driving a white SUV with his daughter buckled into a car seat in the passenger side of the vehicle's backseat, drove south on Homewood Avenue in Toledo, intending to return to his mother's house on North Cove Boulevard. On its south side, Homewood terminates at Hillcrest Avenue, almost directly in front of Willys Park. J.H. turned right onto Hillcrest, heading west toward Jackman Road on a direct route to his mother's house.

{¶ 6} Another vehicle—the driver of which was later identified as Carter—was also driving westbound on Hillcrest. Most of Hillcrest has only two lanes, an eastbound lane and a westbound lane, so the two vehicles were traveling in the single westbound lane. J.H. was driving behind Carter. Carter was driving more slowly than J.H. When J.H. caught up with Carter, he began tailgating him. Carter brake-checked J.H. and slowed down even further. J.H. testified that Carter never put on his blinker, attempted to let J.H. pass, or took any other evasive maneuvers.

3.

{¶ 7} Near the intersection of Hillcrest and Jackman, the westbound lane of Hillcrest expands into two lanes, a left turn lane and a right turn lane. Carter went into the right turn lane. J.H. entered the left lane to continue his direct route to his mother's house. As J.H. approached the intersection, the traffic light was yellow and turning red. J.H. entered the intersection, considering running the red light, but could not do so due to traffic on Jackman. Accordingly, J.H. reversed out of the intersection to avoid being hit by vehicles traveling on Jackman.

{¶ 8} J.H. put his arm up as he reversed the vehicle. He stated that he did not point at or otherwise threaten Carter. He saw Carter—whom J.H. had never seen before that moment—smiling at him, though they did not speak to each other. J.H., who did not have a weapon on his person or in his vehicle, then heard several gunshots and felt a burning where one of the bullets hit his back. J.H. immediately headed straight to Toledo Hospital, which was only a few minutes' drive away. As he drove to the hospital, J.H. realized that his baby daughter had been hit when he saw blood on her.

{¶ 9} As soon as J.H. arrived at the hospital, he and his daughter were placed in adjoining rooms. While the police were questioning J.H., hospital staff informed him that D.H. died. J.H. was also questioned approximately three hours later at Toledo Police headquarters, and then again on April 29 and May 3, 2022.

4.

{¶ 10} J.H. was initially resistant to police questioning, wanting to be with his family, and he was very emotional.[1]  J.H. also wanted to prevent the police from finding the shooter before he did, testifying that he wanted to take revenge against the shooter himself without police involvement because he believed in street justice.  Accordingly, he testified that his answers to the police initially involved a mixture of accurate, mistaken, and deliberately misleading statements.  He told the police that the other vehicle was a light blue four-door car, possibly a Honda.  J.H. admitted that he told the police that the other vehicle came up behind him fast, and that the two vehicles were swerving in lanes. He told another police officer that he was driving behind the other vehicle, the other driver was driving slow like an old person, and the other driver brake-checked J.H.

{¶ 11} J.H. also told officers that he had cracked the window near D.H.'s seat, as was his habit to give his baby fresh air.  At the hospital, the officers pointed out that the passenger front window was open, but J.H. could not remember rolling the window down.  J.H. explained during his testimony that he was not really worried about how or why the window came to be rolled down.

---

[1] During his trial testimony, J.H. continued to be emotional and resistant to the state's involvement in this case, and after multiple emotional outbursts, the trial court found J.H. to be a hostile witness pursuant to Evid.R. 611 and permitted the state to ask leading questions.

5.

### *Police Interviews of J.H. at the Hospital*

{¶ 12} Toledo Police Officer Anthony Wrozek testified that he responded to a 911 call regarding two gunshot victims at Toledo Hospital. As he arrived, Officer Wrozek saw a white Dodge Nitro parked in front of the emergency room entrance. He noted that the vehicle's passenger side had approximately eight bullet holes and the rear passenger window was shot out. When Officer Wrozek encountered J.H., J.H. appeared distraught. He was pacing and pleading with the police, crying and even yelling at times. Officer Wrozek also described the graze wound on J.H.'s back, noting that the wound was approximately eight inches long and between J.H.'s shoulder blades.

{¶ 13} Officer Wrozek said that J.H. had trouble describing the location where the shooting occurred. J.H. initially said he was driving on Willys, and Officer Wrozek thought J.H. meant Willys Parkway, a street in the same neighborhood as Hillcrest and Homewood, but the police eventually realized that J.H. was referring to Willys Park—the park across from the intersection of Homewood and Hillcrest—and that the shooting actually occurred on Hillcrest and Jackman.

{¶ 14} J.H. also initially told Officer Wrozek that the shooter was in a vehicle behind him driving too closely. He later changed his story, however, saying that the shooter's car was in front of his, the shooter was driving very slowly, and J.H. was probably following too closely. After the first 20 minutes or so of the police's initial encounter with J.H., J.H.'s description about which car was in front remained

6.

consistent—he confirmed that he had been the one tailgating the shooter and not the other way around as he initially claimed.

{¶ 15} Throughout all the police questioning, J.H. was consistent about what happened when the two cars came to the intersection at the traffic light at Jackman. J.H. said he drove too far into the intersection over the stop line when the light was red, and he had to reverse to avoid oncoming traffic. J.H. said the shooter opened fire at J.H.'s vehicle when he reversed. J.H. told Officer Wrozek that he leaned forward to avoid the shots, and he also noticed that his daughter's body jumped. J.H. also said that he then immediately completed his turn onto Jackman, heading toward Toledo Hospital, and the other vehicle turned in the opposite direction.

{¶ 16} Officer Wrozek testified that J.H. said that he did not know the shooter and the shooter was wearing a green Nike athletic jacket and driving a light blue vehicle. J.H. said that the shooter appeared to be alone in his vehicle. Other police officers testified similarly, and the state also played video from police body cameras, confirming police testimony about J.H.'s statements and demeanor.

### *Investigation of J.H.'s Vehicle*

{¶ 17} Toledo Police Detective Javier Ramirez, who worked with the Crime Scene Unit, testified about his investigation of J.H.'s vehicle. Detective Ramirez described a bullet defect in the driver's window as well as penetrating defects in both the passenger front and rear doors, for a total of approximately eight defects in the sheet metal. Detective Ramirez analyzed the trajectory of the bullets and determined that at least two

7.

of the bullets penetrated the rear passenger door immediately next to D.H.'s car seat, and he found a bullet defect in the seatbelt in D.H.'s car seat.

{¶ 18} Detective Ramirez explained that when a semi-automatic weapon is fired, the casings from the bullet are ejected from the gun. Detective Ramirez testified that no shell casings or weapons were found in J.H.'s vehicle, and no weapon of any kind was located in the vehicle.

*Neighborhood Videos of J.H.'s Route*

{¶ 19} Detective Leonard Beck, who works with the Video Unit of the Toledo Police Department, testified that he was tasked with locating videos from security and doorbell cameras of residences bordering J.H.'s route from the evening of the shooting. Police were able to assemble four home security videos into one timeline showing J.H. driving along Homewood and Hillcrest in the minutes before the shooting.

{¶ 20} In the timeline video, which was played at trial and for which both Detective Beck and Toledo Police Detective Gary Bunting provided commentary, a silver sedan is seen driving northbound on Homecrest toward Berdan Avenue with its trunk ajar. Approximately nine minutes later, the sedan is seen driving in the opposite direction, southbound, on Homecrest toward Hillcrest, this time with its trunk closed. Shortly thereafter, J.H.'s white Dodge Nitro is seen driving quickly southbound on Homecrest. Approximately a minute after that, the two vehicles are seen driving westbound on Hillcrest near Watson. J.H. drives closely behind the sedan, eventually clearly tailgating. At one point, the driver of the silver sedan appears to "brake check"

8.

the J.H.—the sedan's brake lights come on quickly followed by J.H.'s brake lights. The intersection of Hillcrest and Watson is approximately five or six blocks from the intersection of Hillcrest and Jackman, and the timeline video ends before the vehicles reached that intersection. At no point during the video does either vehicle attempt to pull over, put on a blinker, or swerve. The entire distance of Hillcrest between Homewood and Jackman is about half a mile, with approximately 20 houses and their yards lining the street in that section, but the video shows only a few blocks of the vehicles' path on Hillcrest.

{¶ 21} Detective Bunting provided further information about the intersection of Jackman and Hillcrest. As J.H. testified, westbound Hillcrest expands into two lanes as it approaches Jackman. Vehicles use the left lane to turn southbound onto Jackman— which would be the direction of J.H.'s mother's home and Toledo Hospital—and the right lane to turn northbound onto Jackman toward Berdan. Notably, right turns on red are permitted in the right lane.

{¶ 22} Based on their investigation of the scene of the shooting, J.H.'s description of the shooter's location relative to his vehicle was consistent with the intersection of Jackman and Hillcrest as well as the location of the bullet holes in J.H.'s passenger door.

### Police Interview of Carter

{¶ 23} Sergeant Roy Kennedy of the Toledo Police Department testified that the police did not identify Carter as a suspect in the shooting for several days after it

9.

occurred. No one called the police to turn themselves in, and although the silver sedan was seen on neighborhood home security videos, the license plate was not visible.

{¶ 24} On May 3, 2022, six days after the shooting, police identified Carter as the driver of the silver sedan involved in the shooting using a police camera system located at intersections throughout Toledo. Detective Bunting and Sergeant Kennedy interviewed Carter, and Detective Bunting testified about the interview in conjunction with a video of the interview.

{¶ 25} According to Detective Bunting, Carter initially denied driving on Hillcrest or having any interaction with a white SUV on the evening of the shooting, and he alleged that he was being set up. Carter only admitted to seeing J.H.'s vehicle after the police told him they had several videos of J.H.'s vehicle tailgating Carter's vehicle.

{¶ 26} After additional police questioning, Carter eventually admitted to shooting at J.H.'s vehicle, giving differing explanations for his actions. Carter attributed the shooting to J.H.'s driving, complaining that J.H. was driving "stupid" and was too close to his bumper. Carter also said that when J.H. reached his hand back behind his front passenger seat, J.H. pointed at Carter, so Carter thought if he waited to shoot, then J.H. would kill him first. Carter claimed that J.H. was smiling at him, which he interpreted as a threat. Carter claimed he could see J.H. pointing and smiling through J.H.'s closed rear window, which was tinted dark. Carter admitted, however, that he never saw J.H. with a gun, explaining that he did not want to wait to find out if J.H. had a gun.

10.

{¶ 27} Later, Carter claimed that this was a case of mistaken identity, and he did not shoot J.H. He threatened to sue the police as a result.

{¶ 28} When asked what happened to his gun, Carter said that he pawned the gun at a store on Lewis Avenue in Toledo. Although police investigated all gun transactions at all the pawn stores or other establishments that could buy a gun on or near Lewis Avenue, they could not find any transactions involving Carter and the type of the gun that Carter said he used in the shooting.

### Carter's Firearm Training

{¶ 29} Next, a retired Toledo Police Officer, David Vnuck, testified that he formerly owned a business that specialized in concealed carry classes, and Carter took a concealed carry class from him. In that class, Vnuck taught his students that before shooting, safe gun handling requires a shooter to look both at the target and what is behind the target, explaining that a shooter is responsible for whatever the bullet hits until it is done traveling. Vnuck also instructed his classes that shooting a gun in self-defense requires the shooter to be in fear of the shooter's life or of serious bodily harm, and the shooter may be held criminally or civilly liable for shooting without justification. Finally, Vnuck taught his students that if they shot someone else in self-defense, the students should secure their weapon, make a police report, call an attorney, and explain to the police why they felt the use of the gun was necessary. Vnuck noted that there may not always be a legal requirement to call the police, but that he taught his students to do so.

11.

## Carter's Testimony

{¶ 30} Carter testified at length about his personal history with gun violence. He testified that his mother was killed by gun violence. Carter said that in his neighborhood, he hears gunfire daily. According to Carter, his home has been shot up twice, once shortly after his mother was killed and a second time a few weeks later. Carter said that he had been shot in the leg in 2016 while he and his girlfriend were driving down a side street near Lagrange in North Toledo. Carter said he went to the hospital afterward and was interviewed by the police, but he refused to give them any information about the shooting. On another instance in 2016, Carter said he was shot in the shoulder when he was riding in a car with his uncle near Central and Lagrange and another car suddenly appeared from a side street and began tailgating them. In 2017, while leaving a house party near Carter's residence, Carter was shot in the leg again. Again, Carter did not give the police any details about the shootings. Although the hospital generally must report all gunshot wounds to the police, Carter was not surprised that only one police report identified Carter as a gunshot victim.

{¶ 31} Carter testified that he got a concealed carry permit in 2021, shortly after he was old enough to do so, because of the danger surrounding Carter's neighborhood. However, Carter never went through any stress combat course or any other courses on how to handle quick decisions about whether to shoot.

{¶ 32} Carter then testified about the events on the day of the shooting. That evening, he went to his girlfriend's house. After Carter left her house, he drove

12.

southbound on Homewood, and when he reached the stop sign at Hillcrest, he paused for a bit to find a song to play on his phone. He noticed he was blocking another vehicle that had pulled up behind him at the stop sign, so Carter put on his blinker and turned right onto Hillcrest. Carter testified that after passing approximately two houses, he partially pulled over onto the side of Hillcrest, which was a gravel area, to let the other car pass him and so he could finish choosing his song. Carter then noticed that the other car was stopped in the middle of the street, directly behind him and close to his bumper. Carter said he felt nervous and his stomach was twisting, so he sped up and then pulled off the road again. Again, the driver of the other car did not go around Carter, so he decided to drive forward. Carter saw the other car tailgating him and swerving as he did so. Accordingly, Carter, who was feeling scared that something bad was going to happen, sped up to get the other vehicle away from his bumper. Carter also said he tapped his brakes to get the other vehicle to back up, but that did not work, so Carter just kept speeding up.

{¶ 33} As Carter approached the light at Hillcrest and Jackman, the light was green, and Carter initially got into the left lane and put his left turn signal on. Then the light turned yellow, so Carter jerked over to the right lane, put on his right turn signal, and slammed on his brakes just short of the white line. Carter testified that he froze at that moment and watched to see what the other vehicle would do.

{¶ 34} Carter saw the other vehicle pass him and go into the left lane, where the vehicle stopped before the white line. Carter saw the other vehicle begin to reverse

13.

slowly and then start speeding as he reversed. The back passenger window then cracked open, and Carter saw the driver "cheesing," which he described as smiling as if the person is up to something. He testified that in the past he saw someone walk into a party and start cheesing at another person before shooting that person. Carter saw the other driver reach down to shift and then swing his arm back across the passenger seat, and then the passenger window rolled down. Carter testified that all this happened very quickly. As soon as Carter saw the other driver put his arm up and roll his window down, Carter grabbed his gun out of the holster in his pants and started shooting. After Carter was done shooting, the other vehicle sat there for a moment, then turned left onto Jackman, and Carter turned right onto Jackman.

{¶ 35} While Carter acknowledged learning in his concealed carry class that he should call the police after shooting in self-defense, he stated that people in his neighborhood generally do not talk to the police about shootings. Accordingly, Carter did not contact the police.

{¶ 36} Carter testified that he only ever saw the driver in the vehicle, he did not see a gun anywhere in the other vehicle, and he did not see a baby seat in the backseat. Carter only learned about D.H.'s death a few days later after news about her death became widespread on social media.

{¶ 37} Carter also testified that when the police pulled him over on May 3, 2022 and when they initially started questioning him about driving on Homewood, he had no idea why. He could not explain why his testimony regarding the events leading to the

14.

shooting included several details that he did not mention during his police interview on May 3. Carter also flatly denied that during his police interview he claimed that the police had mistakenly identified him as the shooter or threatened to sue the police, continuing to deny that he made the statements even though the video of his interview was admitted into evidence.

{¶ 38} Finally, Carter could not explain why he got rid of the gun a few days after the shooting. He continued to maintain that he sold it to a pawn shop on Lewis Avenue despite the lack of a record evidencing the sale.

### *Jury Verdict*

{¶ 39} After the parties rested, the trial court instructed the jury. These instructions included the standard for self-defense, explaining that the state had the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense in using deadly force. The court also gave the jury a consciousness of guilt instruction.

{¶ 40} After deliberations, the jury found Carter guilty on all counts.

## II. Assignment of Error

{¶ 41} Carter asserts the following assignment of error for review:

{¶ 42} The jury's verdict was against the manifest weight of the evidence presented at trial.

15.

### III. Arguments of the Parties

{¶ 43} In support of his assignment of error, Carter asserts that the state did not meet its burden in disproving beyond a reasonable doubt that Carter acted in self-defense. Carter concedes that he used deadly force, but he alleges that he was permitted to use deadly force under the circumstances. Specifically, Carter argues that J.H. created the situation by tailgating him; Carter believed that J.H. was about to shoot him because J.H. smiled at him while lifting his arm, reversing his vehicle, and rolling his window down; and Carter had no duty to retreat because he was driving on a public roadway. Carter also points to his own history with gun violence to further support his belief that J.H. would shoot him.

{¶ 44} In response, the state argues that there was credible, competent evidence to support a finding that Carter was at fault in creating the situation, either by brake-checking J.H. and driving slowly down Hillcrest or by responding disproportionately to a road-rage incident. The state contends that there was credible, competent evidence to support a finding that Carter did not reasonably conclude that he was in imminent danger of death or serious bodily harm. In support, the state points to the inconsistency between Carter's testimony regarding his fear of J.H. at trial and his statements to the police, that Carter never saw J.H with a gun or any weapon and no weapon was found in J.H.'s vehicle, the inconsistencies in Carter's descriptions about what he was able to see inside of J.H.'s vehicle immediately before the shooting, and Carter's actions following the shooting in leaving the scene without notifying the police and disposing of the weapon.

16.

# IV. Law and Analysis

{¶ 45} "Self-defense is an affirmative defense—not an element of a crime." *State v. Greer*, 2023-Ohio-103, ¶ 33 (6th Dist.), citing *State v. Messenger*, 2022-Ohio-4562, ¶ 24. Although the burden to establish an affirmative defense typically remains with the defendant, R.C. 2901.05(B)(1) created a burden-shifting framework for self-defense. *Messenger* at ¶ 25. The defendant bears the initial burden to present some evidence, if believed by the jury, that would establish the defendant intentionally used force "to repel force or escape force." *State v. Wilson*, 2024-Ohio-776, ¶ 18, 25. "Once a defendant presents any evidence 'that tends to support that [he or she] used the force in self-defense …,' the state "must prove beyond a reasonable doubt that the accused person did not use the force in self-defense….'" *State v. Lane*, 2023-Ohio-1305, ¶ 16 (6th Dist.), quoting R.C. 2901.05(B)(1). Accordingly, the defendant bears the initial burden of production, and then the state bears the burden of persuasion. *Id.*

{¶ 46} On appeal, "a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion." *Messenger* at ¶ 26. Under a manifest-weight standard of review, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "The discretionary power to grant a new trial should be exercised

17.

only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, quoting *Thompkins* at 387.

{¶ 47} A claim of self-defense using deadly force involves three elements. *Lane* at ¶ 15, citing *Messenger* at ¶ 14. "A person may use deadly force in self-defense where he (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) did not violate any duty to retreat or avoid the danger." *Id.* To overcome a defendant's claim of self-defense, the state need only disprove one element beyond a reasonable doubt. *Maumee v. Yeager*, 2024-Ohio-858, ¶ 97 (6th Dist.). Here, the state conceded that Carter had no duty to retreat, so only the first two elements of self-defense were at issue at trial.

{¶ 48} The second element of self-defense, that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force, involves both a subjective and objective test. *State v. Lathan*, 2024-Ohio-2514, ¶ 77 (6th Dist.), quoting *State v. Thomas*, 77 Ohio St.3d 323, 330 (1997). The factfinder must consider "the bona fides of defendant's belief, and reasonableness therefor, and whether, under the circumstances, he exercised a careful and proper use of his own faculties." *State v. Stevenson*, 2018-Ohio-5140, ¶ 42 (10th Dist.), quoting *State v. Sheets*, 115 Ohio St. 308, 310 (1926). Accordingly, the second element of self-defense generally requires the trier

18.

of fact to evaluate the defendant's credibility. *State v. Olsen*, 2023-Ohio-2254, ¶ 57 (11th Dist.), citing *State v. Walker*, 2021-Ohio-2037, ¶ 13 (8th Dist.).

{¶ 49} An appellate court must "extend special deference to the fact-finder's credibility determinations given that it is the finder of fact who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). As such, "'a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version' and rejected the defendant's claim of self-defense." *State v. Lawler*, 2023-Ohio-3933, ¶ 33 (5th Dist.), quoting *State v. Bentley*, 2023-Ohio-1792, ¶ 24 (11th Dist.). *See also State v. Walker*, 2021-Ohio-3860, ¶ 73 (6th Dist.), quoting *Thompkins* at 386. Indeed, "[e]ven where a person asserting self-defense asserts 'uncontroverted trial testimony' in support of his or her defense, the trier of fact is still free to accept or reject his or her version of events." *State v. Tuggle*, 2023-Ohio-3965, ¶ 63 (6th Dist.), quoting *State v. Olsen*, 2023-Ohio-2254, ¶ 57 (11th Dist.).

{¶ 50} Here, the jury could have found that Carter's actions were objectively unreasonable and his testimony regarding his subjective fear lacked credibility. Carter admitted that he never saw J.H. with a weapon. At most, therefore, J.H. tailgated Carter and then reversed his vehicle with his window down while pointing and smiling at Carter. Carter, in response, shot at J.H. eight times, fled the scene, and disposed of his weapon.

19.

{¶ 51} Even though Carter attempted to explain his overreaction by testifying about his history as a victim of gun violence, the jury could find that Carter's testimony lacked credibility. Indeed, in addition to evaluating Carter's testimony itself, the jury had other evidence to support a finding that Carter was not credible, including the inconsistent statements he gave the police, his denial of threatening to sue the police despite video evidence of his statement, and his failure to provide a plausible explanation of what happened to his gun. *See State v. Tunstall*, 2024-Ohio-2376, ¶ 23 (2nd Dist.) (explaining that appellant's initial denial of any knowledge of shooting at issue along with other inconsistent statements during police questioning were a sufficient basis for a reasonable juror to discredit appellant's testimony claiming self-defense). Further, Carter's actions in disposing of the weapon demonstrate a consciousness of guilt, which supports a jury's rejection of self-defense. *See State v. Knuff*, 2024-Ohio-902, ¶ 211 (describing the appellant's efforts to dispose of evidence as supporting the jury's rejection of self-defense claim).

{¶ 52} Because the jury had evidence on which to find the state carried its burden on the second element of self-defense, we need not address the first element of self-defense. This is not the exceptional case in which the jury clearly lost its way and the evidence weighs heavily against the conviction, and Carter's assignment of error is not well-taken.

20.

## V.  Conclusion

**{¶ 53}** For the foregoing reasons, Carter's appeal of the April 27, 2023 judgment of the Lucas County Court of Common Pleas is affirmed.  Carter is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Gene A. Zmuda, J.

Myron C. Duhart, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.