**[Cite as *In re K.M.*, 2025-Ohio-1685.]**

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
HURON COUNTY

In re K. M.

Court of Appeals No. H-24-019

Trial Court No. JUV-2024-00016

**<u>DECISION AND JUDGMENT</u>**

Decided: May 9, 2025

* * * * *

Richard Palau, for appellee.

W. Alex Smith, for appellant.

* * * *

**SULEK, PJ.**

{¶ 1} Appellant, K.M., appeals from the May 21, 2024 judgment of the Huron County Court of Common Pleas, Juvenile Division adjudicating him a delinquent child for committing an act that if charged as an adult would constitute a violation of R.C. 2903.13. For the reasons that follow, the trial court's judgment is affirmed.

## I.    Factual and Procedural Background

{¶ 2} On February 1, 2024, a complaint was filed against K.M. alleging that he had knowingly caused or attempted to cause physical harm to a police officer in violation

of R.C. 2903.13(A) and 2903.13(C)(5)(a), a fourth-degree felony.  An adjudicatory hearing was held on the matter on June 10, 2024.

{¶ 3} At the hearing, Officer Ricardo Blanco testified that on January 24, 2024, he was working as a police officer for the Wakeman Police Department when he received a call from K.M.'s mother ("Mother") requesting assistance with her son, who was 16 years old at the time.  Mother said that her son was acting erratically, running around the house naked, and screaming.  Officer Blanco responded to the call and went to Mother's home, located in Huron County, in his marked police cruiser and while wearing his police uniform.

{¶ 4} When Officer Blanco arrived, he spoke to Mother, who was outside waiting for the police.  Officer Blanco testified that he heard screaming and glass breaking, and when he entered the home, he found K.M. naked, running around in circles, and screaming.  Officer Blanco noted the smell of alcohol and that K.M.'s "eyes were all black."

{¶ 5} According to Officer Blanco, Mother warned him not to allow K.M. to get near his bedroom because K.M. had knives and swords in his room.  Officer Blanco got K.M. into the living room, but was unable to communicate with him.  Instead, K.M. kept screaming and saying the same thing over and over again—"something about God and dead and my name is [K.M.]," and K.M. was "being very weird, like not acting right." Despite Officer Blanco's attempts to calm K.M., K.M. started throwing objects at him, including picture frames and glasses.  Officer Blanco then tried to calm K.M. by touching

2.

him, but K.M. pushed and then punched Officer Blanco several times in his head and torso in an attempt to return to his room. During that time, Officer Blanco tried to get K.M. under control but was unable to do so.

{¶ 6} Officer Blanco testified that he decided to tase K.M. to get him under control. He stated that Mother and her boyfriend were screaming, "please tase him, please tase him," because K.M. was "very erratic, destroying the house." Officer Blanco had to tase K.M. twice because the first time K.M. was tased, K.M. took the prong off. After K.M. was tased the second time, Officer Blanco put handcuffs on K.M. with the assistance of Mother's boyfriend, who held K.M.'s legs down. Officer Blanco then used his radio to contact the Wakeman chief of police, Jim Rico, for assistance as well as emergency medical personnel. K.M. was eventually taken away in an ambulance.

{¶ 7} Chief Rico testified next, beginning with a description of the scene upon his arrival. He said that Mother and her boyfriend were both relatively calm and kind. K.M. was in handcuffs and sitting calmly in the living room, but he was acting strange. Chief Rico explained that K.M.'s speech was very rapid, his eyes were dilated, and he was sweating profusely. K.M. introduced himself to Chief Rico approximately "every 15 seconds on a loop" and said "nonsensical things every couple seconds" for the entire 15 to 20 minutes that Chief Rico was at the house. Chief Rico also noted broken alcohol bottles and that K.M. also smelled of alcohol. At no point, however, did Chief Rico observe K.M. acting aggressively.

3.

{¶ 8} Chief Rico spoke with Mother and her boyfriend about what happened. Both told him that K.M. was tased to prevent K.M. from getting to his room because he had knives and a sword in there. Mother also told Chief Rico that she had been having problems with K.M. and that he was on probation or had charges pending against him.

{¶ 9} Finally, Mother testified that on the night of his arrest, K.M. had been acting "erratically" and "irrationally," was crawling around naked, and was hitting his bedroom door with a sword. Accordingly, when Mother called 911, she told the operator that K.M. was acting erratically, she "had attempted to contain him," and she needed help. At the time Mother called 911, K.M. was naked in his room, and Mother was trying to keep him in his room until he put some clothes on. K.M. tried to get out of the room by hitting the door with his sword. Mother told the 911 operator that K.M. had knives and swords in his room.

{¶ 10} Officer Blanco responded to her call, and when he arrived, there was broken glass on the floor. Mother told him that K.M. had just smashed a wine bottle from which he had taken a swig. Mother explained that K.M. was acting erratically and she did not know what to do, and she needed help. K.M. was "coming down the hallway and into the kitchen," where Officer Blanco first approached K.M. Mother denied that she told Officer Blanco to keep K.M. from his room, insisting that she only told the 911 operator about the knives and swords there.

{¶ 11} Officer Blanco and K.M. then went into the living room. K.M. was pacing around on one side of the living room, near a Christmas tree, and Officer Blanco was near

4.

K.M, trying to speak to him and calm him down. Mother and her boyfriend were on the other side of the room, behind the couch. K.M. took a Christmas ornament off the tree and "threw it in [Officer Blanco's] general direction," and then started walking toward Officer Blanco. At that point, Officer Blanco tased K.M. Mother denied asking Officer Blanco to tase K.M., denied that K.M. hit Officer Blanco, and maintained that the only item K.M. threw was a single Christmas ornament.

{¶ 12} Mother confirmed, however, that after K.M. was tased for the first time, he pulled the prong out of his abdomen and continued to walk forward, so Officer Blanco tased him a second time. Mother testified that she was feeling "very emotional" after her son was tased, but she believed that when K.M. continued to walk forward after being tased, he was not being aggressive and instead "he was just trying to get away from the situation."

{¶ 13} Mother also denied that her boyfriend assisted Officer Blanco while K.M. was being handcuffed. Instead, she stated that Officer Blanco asked her boyfriend to put his knee on K.M.'s back while Officer Blanco went to his car to get his radio to call for backup.

{¶ 14} Mother also confirmed that she told Chief Rico that K.M. was on probation at the time and gave him the name of K.M.'s probation officer. After Chief Rico arrived, Mother heard Officer Blanco tell him that he did not want to press charges. According to Mother, Chief Rico responded, "You can't tase a minor and not press charges." Chief

5.

Rico later told Mother that charges would be brought against K.M., but that he would likely be charged with disorderly conduct or menacing.

{¶ 15} After closing arguments, the trial court found beyond a reasonable doubt that K.M. knowingly caused or attempted to cause physical harm to an officer in the performance of his duties, and adjudicated K.M. delinquent. The trial court explained that on the evening in question, a very violent and turbulent situation was occurring—to such extent that Mother and her boyfriend positioned themselves behind a couch while Officer Blanco attempted to calm K.M. The trial court pointed out that Mother also recognized the violent and turbulent nature of the incident when she called the police to request that they come to her home to intervene.

{¶ 16} After a 30-day continuance, the court held a dispositional hearing at which the court ordered that K.M. be placed in a juvenile correctional facility for a period of six months. K.M. filed a timely notice of appeal.

## II.     Assignment of Error

{¶ 17} K.M. asserts a single assignment of error for review:

K.M. was adjudicated a delinquent child against the manifest weight of the evidence.

## III.     Law and Analysis

{¶ 18} When reviewing a manifest weight claim, "'[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction

6.

must be reversed and a new trial ordered.'" *State v. Lang*, 2011-Ohio-4215, ¶ 220, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). In a manifest-weight challenge, an appellate court "extend[s] special deference to the fact-finder's credibility determinations given that it is the finder of fact who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor." *State v. Carter*, 2024-Ohio-5031, ¶ 49 (6th Dist.), quoting *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* at ¶ 46, quoting *Thompkins* at 387.

{¶ 19} Here, K.M. was adjudicated delinquent for violating R.C. 2903.13(A), which provides that "no person shall knowingly cause or attempt to cause physical harm to another," and R.C. 2903.13(C)(5)(a), which provides that the offense is a fourth-degree felony if "the victim of the offense is a peace officer … while in the performance of the officer's… official duties." R.C. 2901.22(B) defines knowingly as follows:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

Notably, "voluntary intoxication may not be taken into consideration in determining the existence of a mental state that is an element of a criminal offense," including

7.

intoxication "resulting from the ingestion of alcohol, a drug, or alcohol and a drug." R.C. 2901.21(E), (F)(4). Finally, a "peace officer" includes a "member of the organized police department of any municipal corporation, … [and a] police officer of a township or joint police district." R.C. 2935.01(B).

{¶ 20} In support of his assignment of error, K.M. argues that the trial court's judgment that he violated R.C. 2903.13(A) and (C)(5)(a) was against the manifest weight in three ways. First, he contends that Officer Blanco was not acting within his official duties as a police officer. Next, K.M. argues that he did not "knowingly" harm or attempt to harm Officer Blanco. Finally, K.M. alleges that there was no evidence that Officer Blanco suffered any physical harm.

## A. Official Duties

{¶ 21} K.M. argues that Officer Blanco was acting outside his official duties because he had only been called for a welfare check on K.M. K.M. claims that because he was not actively harming anyone or anything when Officer Blanco arrived, Officer Blanco's actions in intervening and subduing K.M. were outside the scope of Officer's Blanco's duties and Officer Blanco should have instead left his home.

{¶ 22} A police officer's official duties include preserving the peace and protecting persons and property. *See State v. Hayes*, 1992 WL 357257, *2 (8th Dist. Nov. 25, 1992) (noting that police officers' official duties are "to preserve the peace and to protect persons and property"). *See also* R.C. 737.11 ("The police force of a municipal

8.

corporation shall preserve the peace, protect persons and property…").  Here, Officer Blanco was acting within those duties as he attempted to subdue K.M.

{¶ 23} Indeed, Mother called 911 to request police assistance because K.M. was acting erratically and she could not contain him, reporting that he was in his room with knives and was striking his bedroom door with a sword.  Officer Blanco responded to that call in his police uniform while on duty as a police officer.  Upon Officer Blanco's arrival, he found a broken alcohol bottle on the floor and a nude K.M. continuing to act erratically—screaming, pacing, and speaking irrationally—and apparently under the influence of an intoxicant.  Even according to Mother's testimony, she and her boyfriend remained across the room, outside of K.M.'s immediate physical proximity, while Officer Blanco attempted to calm K.M.  K.M. did not respond to Officer Blanco's efforts to calm him.  Instead, K.M. threw at least one object at Officer Blanco and attempted to leave the living room, possibly on his way to his bedroom, where he would have access to numerous weapons in an intoxicated and irrational state and where he had only a short time earlier been using the sword.

{¶ 24} The weight of the evidence establishes that K.M. was a danger to himself and others—as demonstrated by Mother's decision to call 911 and to place herself across the room and behind a couch during Officer Blanco's encounter with K.M.—and thus Officer Blanco was performing his official duties as a police officer to keep the peace and to protect persons and property when he acted to subdue K.M.

**B.  Knowingly**

9.

**{¶ 25}** Next, a finding that K.M. acted "knowingly" in causing or attempting to cause harm to Officer Blanco was also not against the manifest weight of the evidence. K.M. argues that his purpose was not to harm Officer Blanco, but instead he only wanted to get away from him. K.M. maintains that Officer Blanco, not K. M., initiated their physical encounter, arguing that "Officer Blanco got so close to an individual who was already acting erratically that the erratic behavior turned into an altercation." K.M. concedes that he took an illegal drug that night, but he nonetheless contends that he could not have foreseen that a law enforcement officer would attempt to subdue him in his own home when he was not committing a crime and therefore harm to a police officer was not a foreseeable consequence of his actions.

**{¶ 26}** Contrary to K.M.'s arguments, to act knowingly does not require that a person act with a certain purpose. R.C. 2901.22(B). Accordingly, "assault does not require that a defendant intend to cause physical harm, but 'only requires that the defendant acted with awareness that the conduct probably will cause such harm.' " *State v. Pierce*, 2023-Ohio-528, ¶ 24 (8th Dist.), quoting *State v. Lucas*, 2021-Ohio-2721, ¶ 21 (11th Dist.), quoting *State v. Skjold*, 2004-Ohio-5311, ¶ 24 (11th Dist.). "Flailing" or other movements intended to avoid arrest or detention may constitute assault if it was probable that the movements or flailing would cause a police officer harm. *Id*. at ¶ 25, 27 (8th Dist.) (holding that state set forth sufficient evidence that appellant acted knowingly in causing police officer harm even if "the physical contact between him and [the officer] was incidental to his efforts to evade from the officers [and] not an effort to cause or

attempt to cause the officer harm"); *State v. Standifer*, 2012-Ohio-3132, ¶ 27 (12th Dist.) (explaining that "the state was not required to prove that appellant specifically intended to kick [a police officer] but instead it had to establish that appellant was aware that "flailing" and kicking her foot backwards would probably cause [the police officer] harm").

{¶ 27} Moreover, voluntary intoxication cannot be considered when determining if a defendant has a requisite mental state for an offense. R.C. 2901.21(E). For example, in *State v. K.W.*, 2016-Ohio-7365 (12th Dist.), the appellate court rejected the appellant's argument that because his intoxication from " 'multiple substances' … impacted his ability to act knowingly," his adjudication for an assault on a police officer was against the manifest weight of the evidence. *Id*. at ¶ 28. The court explained that voluntary intoxication could not be considered in evaluating the appellant's mental state. *Id*.

{¶ 28} Here, Officer Blanco testified that K.M. hit him several times in the face and the torso and K.M. threw several objects at him, and Mother testified that K.M. merely threw one object in Officer Blanco's "general direction." The trial court, as the finder of fact, could have found Officer Blanco's testimony to be more credible than Mother's testimony, particularly in light of the undisputed testimony of K.M.'s other actions that night, which included breaking a wine bottle and using a sword to hit his bedroom door in an attempt to exit the room, as well as Mother's determination that she and her boyfriend needed police assistance to contain K.M. and that they should stay out of K.M.'s physical proximity while Officer Blanco attempted to calm K.M.

11.

{¶ 29} K.M. explains his actions by claiming that he was merely trying to get away from Officer Blanco, not trying to harm him. K.M. maintains that Officer Blanco would not have been in danger of being harmed if only he had kept away from K.M., who was having "an episode" that preceded Officer Blanco's arrival. Regardless of whether K.M.'s purpose was to harm Officer Blanco or merely to get away from him, he does not dispute that he was aware that his actions could have harmed Officer Blanco. K.M. only needed to have been aware that his actions could have harmed Officer Blanco—regardless of whether he intended to harm Officer Blanco—for his actions to have been knowing. Moreover, K.M.'s voluntary intoxication from the ingestion of an illegal drug cannot negate that his actions were knowing. Accordingly, the trial court did not clearly lose its way in finding that K.M.'s actions were knowing.

## C. Harm

{¶ 30} Finally, K.M.'s argument regarding the lack of evidence that Officer Blanco was actually harmed also fails. To establish that K.M. violated R.C. 2903.13(A) and 2903.13(C)(5)(a),"the State did not need to prove that the officer[] [was] actually harmed, only that [K.M.] attempted to cause physical harm." *State v. Wacasey*, 2025-Ohio-1257, ¶ 12 (8th Dist.), citing *In re G.K.*, 2022-Ohio-2124, ¶ 19 (5th Dist.). Accordingly, the lack of evidence that Officer Blanco was actually harmed does not make K.M.'s adjudication against the manifest weight of the evidence.

{¶ 31} Because K.M.'s adjudication was not against the manifest weight of the evidence, his assignment of error is not well-taken.

12.

### IV. Conclusion

**{¶ 32}** For the foregoing reasons, the judgment of the Huron County Court of Common Pleas, Juvenile Division is affirmed. K.M. is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

JUDGE

Myron C. Duhart, J.

JUDGE

Charles E. Sulek, P.J.
CONCUR.

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.