[Cite as *State v. Pettaway*, 2025-Ohio-2260.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio/City of Toledo      Court of Appeals No. {48}L-24-1154

     Appellee      Trial Court No. CRB2309247

v.

Edward E. Pettaway      **DECISION AND JUDGMENT**

     Appellant      Decided: June 27, 2025

* * * * *

Tyler Naud Jechura, Esq., for appellant.

Rebecca Facey, Esq., Prosecutor and
Jimmie L. Jones, Esq., Assistant Prosecutor, for appellee.

* * * * *

**MAYLE, J.**

**{¶ 1}** Appellant, Edward Pettaway, appeals the May 24, 2024 judgment of the Toledo Municipal Court sentencing him following his conviction of domestic violence and assault. For the following reasons, we affirm.

# I. Background and Facts

{¶ 2} Pettaway was charged by complaint with one count each of domestic violence in violation of R.C. 2919.25(A) and assault in violation of R.C. 2903.13(A), both first-degree misdemeanors. The charges arose from allegations that Pettaway slammed his wife, G.P., on the floor and ripped her glued-on wig from her head.

Pettaway's case was tried to the court. At trial, the city presented the testimony of G.P. Pettaway presented the testimony of Toledo Police Department officers Richard Wrobel and Bradley Wittmann and testified in his own behalf.

{¶ 3} G.P. testified that she and Pettaway got into an argument on September 18, 2023. Before Pettaway started the argument, she was sitting on the couch doing nothing to him. He came up to her while she was on the couch, began yelling at her, and told her to get out of the house. After Pettaway approached her, G.P. recalled him "snatching" her off the couch, "[k]ind of throwing [her] around on the floor[,]" and putting his knee in her back and "snatch[ing]" her wig, which was glued on, off of her head. She elaborated that he was "grabbing [her] by [her] t-shirt and yanking [her] to get off the couch." When Pettaway pulled her off the couch, she yelled at him to stop and tried to get him to let go of her by "[p]ushing him back off." She was also "swinging" at him but was unsure if she hit him. She fell to the floor as she tried to push him. Once she was on the floor, Pettaway "constantly just kind of drug [her] back and forth." As a result, G.P.'s shirt and bra were torn, she had bruising on her left arm, hair around her hairline was missing, and her shoulder and knee hurt. Pettaway pulling off her wig was painful.

2.

{¶ 4}　During these events, G.P. called 911.  The city played the call at trial.  G.P. was unable to speak when she called, but the call picked up some background noise.  G.P. said that the noises on the call were Pettaway "throwing [her] around[,]" a dog barking, and her and Pettaway yelling.  Most of the call is unintelligible.  At one point, G.P. asks if she can get some of her things and leave, which leads to her and Pettaway fighting about who should actually leave the house.

{¶ 5}　After this encounter, G.P. went down the stairs to get away from Pettaway and asked him if she could get their son and some things and leave.  Pettaway let her go upstairs to get their son.  While she was upstairs, she put on a headscarf and texted her father.  When she came back down, Pettaway said that he would leave the house, but he changed his mind shortly after.  When G.P. again said that she was leaving, Pettaway told her that she could not and "slammed" the front door.  She tried to run out a back door, but Pettaway also "slammed it shut when [she] opened it."  After that, Pettaway began yelling again.  He pushed G.P. while she was holding their child, so G.P. went back to the couch to prevent him from hurting the baby while trying to hurt her.  Once she was sitting, Pettaway "snatched" her watch off of her wrist and took her phone.  He then went downstairs to the gun safe, took out some guns, put them on the stairs, "lifted [one] in the air[,]" told G.P. "this is all your fault" and said, "I'm sorry son."  When he said that, G.P. ran out of the house through the back door, ran through neighbors' yards, and hid by the side of a neighbor's house until she saw the police coming.

3.

{¶ 6} When she saw the police arrive, G.P. walked back to her house. Officers were talking to her father, and when she approached, they talked to her. The officers did not take any photographs of G.P.'s injuries. However, G.P. took several pictures later that day, including two that she took while she was at the emergency room. The pictures show a tear in the collar of her shirt, redness or bruising on her shoulder, redness on her cheek, and her holding a handful of hair.

{¶ 7} On cross-examination, G.P. testified that the officers who responded to her house did not arrest Pettaway or charge him with any crimes. She told one of the responding officers that the bruises on her arm were "new" and that Pettaway had "ripped [her] hair off[,]" but did not point out any other injuries, say that she was in pain, or tell the officers that Pettaway had lifted her off of the couch or "slammed [her] repeatedly[.]" G.P. went to the emergency room that day.

{¶ 8} While Pettaway was pulling on her and she was on the floor, she was "kicking and flailing [her] arm to have him let [her] go[,]" but claimed that she only touched Pettaway "[i]n self-defense." She did not know what happened to her wig.

{¶ 9} On September 21, 2023, three days after the incident, G.P. went to the police station to get a copy of the report from September 18. When the officer on duty could not find a report, someone from internal affairs told G.P. to file a report herself. She reported the events from September 18 to the duty officer, who decided to file charges against Pettaway. She claimed that she told the duty officer "the full story. Because the [responding] officer, on the scene, cut [her] off" and she did not "get to tell

4.

him the full story." She did not tell the duty officer about or give him the pictures she took. She admitted that the pictures did not have timestamps.

{¶ 10} G.P. denied that (1) she had "planned this situation, between [her] and Mr. Pettaway, in a[n] attempt to convict him of a crime"; (2) she wanted Pettaway to be convicted of domestic violence because of their relationship issues; (3) she told the duty officer at the police department a different story than she told the officers at her house; (4) her wig was on under the headscarf she was wearing in the body cam video; (5) she damaged the house's front door by hitting it with a brick; (6) she was ever aggressive with or hit Pettaway before this incident; or (7) she hit Pettaway when their son was present.

{¶ 11} During G.P.'s testimony, the city played the body camera video of Wrobel, one of the responding officers. In the video, Pettaway explains that he needed someone to come get him because he had gone through too much with G.P. After listening to Pettaway's complaints—which did not address the specifics of his and G.P.'s fight that day—Wrobel concludes that "there's not a whole lot for [the officers] to do here. You guys are just arguing, and she left." He advises Pettaway to stay somewhere else for a night or two if G.P. returns to the house and is argumentative. As G.P. is walking back toward the house, Pettaway tells the officer about her torn shirt and that he and G.P. "got into a shoving match" but he "didn't hit her."

{¶ 12} G.P. is crying and standing on the street with her father and son when Wrobel approaches her. Her father asks her about calling 911, and she says that she

5.

called but was not able to talk and Pettaway took her watch and phone. She explains that Pettaway picked the fight and "grabbed [her] and ripped [her] hair off . . . ." When she told Pettaway that she was going to leave, he responded by saying that he was going to leave and going upstairs to pack. When he came back downstairs, he said that he was not leaving and "started pushing [G.P.] while [she] had the baby . . . ." She also tells Wrobel that Pettaway ripped her shirt.

{¶ 13} Wrobel tells both Pettaway and G.P. that he is going to file a report, and they can take the report to the prosecutor's office if they want to press charges.

{¶ 14} The city also played Pettaway's 911 call during G.P.'s testimony. In it, Pettaway tells the operator that they need to "come get [him]" because he got into a fight with his wife and is "not feeling well." His father was coming to take his firearms, which were unloaded and "sitting [t]here." When the operator asks if there was "anything physical with [his] wife . . . ," Pettaway replies, "[y]eah, I mean, I didn't hit her or nothing, but she's got some—." Pettaway cuts off his comment to tell the operator that the police are there.

{¶ 15} The state rested after G.P.'s testimony.

{¶ 16} For his case, Pettaway first presented Wrobel's testimony. Wrobel testified that Pettaway said that he and G.P. had been arguing all day, "the two of them had pushed each other a little bit, . . ." he did not know where G.P. was, and he did not want to press charges. When Wrobel talked to G.P., she told him that she and Pettaway had been arguing all day, Pettaway had pushed her, Pettaway had pulled off her wig while

6.

they were "scuffling," and she was going to leave the house with the children. She did not tell him about Pettaway taking his guns out of the safe or preventing her from leaving the house, or her breaking free from Pettaway to run out the door. Based on the information Pettaway and G.P. provided, Wrobel concluded that "it just seemed like they were arguing. It got heated. There was maybe some pushing and shoving going on. And then she left." Wrobel stayed at the house until G.P.'s father arrived, she gathered some things, and she and her father left.

{¶ 17} Wrobel did not see any physical injuries on G.P. and did not recall G.P. telling him about any injuries. He told both Pettaway and G.P. that he was going to file a report, and they could press charges against each other if they wanted to. Wrobel could not determine the "initial aggressor," which "gives you who the victim is . . . ."

{¶ 18} Defense counsel asked Wrobel to compare his report from September 18 to the police report G.P. filed on September 21. He said that "there is definitely accusations of acts of violence . . ." in the September 21 report, while his report was "just more of argument." G.P. did not tell him about the violent acts that she alleged in the September 21 report.

{¶ 19} On cross, Wrobel said that he spent most of his time at the scene talking to Pettaway because G.P. was not there when he arrived. When he approached G.P., he noticed that her shirt was a little torn.

{¶ 20} Next, Wittmann testified that he was the officer on duty when G.P. came to the police station on September 21. He confirmed that this was three days after the

7.

alleged domestic violence incident. She told him that officers had been out to their house on a domestic violence call, but he was not able to find a record of the call in the call logs, and neither he nor the records department could find a report.

{¶ 21} After taking a report from G.P., Wittmann filed the complaints against Pettaway. He decided to do so based on the information G.P. gave him and the injuries he saw on her, and without talking to Pettaway.

{¶ 22} When he compared his report to Wrobel's, Wittmann noted that Wrobel did not determine a primary aggressor; issue any charges; or mention firearms, Pettaway blocking the door so G.P. could not exit, Pettaway taking her phone and watch, or Pettaway slamming her to the floor. After seeing Wrobel's report, Wittmann would not have charged Pettaway with domestic violence because he "would have came to the same conclusion as the other officer. There was not enough there to charge either party."

{¶ 23} On cross, Wittmann said that G.P. was missing patches of hair from her head when she came in. He confirmed that G.P. came to the police department on September 21 to get the report from the incident on September 18; she did not come in intending to file a new report.

{¶ 24} Finally, Pettaway testified. He said that he and G.P. were in the middle of a divorce. They had separated previously, but G.P. "begged [him] to come home." A week before this incident, when Pettaway asked her for a separation, G.P. punched him in the face and stood in front of his car as he tried to leave with their child. They were having problems because any time he tried to "enforce some rules, the police got threated

8.

to get called on [him]." G.P. and her mother had threatened to call the police on Pettaway four other times.

{¶ 25} On September 18, the argument between him and G.P. began because he asked her to leave, as he had been doing for several days. When he "calmly" approached her about it, "she went crazy." He elaborated that he approached her while she was sitting on the couch watching TV to ask her questions about whether they were separating and where she planned to live, but the "more [he] asked, the more irate she got . . . ." He went outside to get away from G.P., but she followed him, "cussing at" him. As they approached the driveway, Pettaway spun around, went back into the house, and locked the door. G.P. responded by picking up a paver and "beat[ing] on the door handle." He admitted to grabbing G.P.'s shirt but said he only did so "[a]fter she tried to bash the door in with a brick" because he "knew, at that point, [he] was in danger."

{¶ 26} After G.P. came back into the house, he blocked the door to keep her from leaving with their child.

{¶ 27} He denied lifting G.P. off the couch, ripping her wig off, slamming her on the floor, or taking her watch and phone. G.P. pushed him when he started talking about getting a divorce. She was "highly upset" and "irate," and Pettaway could not calm her down. He did not push her back, but they both fell to the floor.

{¶ 28} After they fell, Pettaway moved away from G.P. She went upstairs to use the bathroom. When she came out, she was "yelling and cussing and stuff" and told Pettaway that "[he] was going to die, and she hoped that it happened real soon."

9.

{¶ 29} Pettaway said that G.P. did not call 911, but "showed [him] that she was going to call . . . ." He was unaware that the call had gone through and recorded the background noise. The noises on the call were him and G.P. yelling at each other at the beginning of their fight; none of the "physical stuff"—i.e., G.P. hitting the door with a brick and her shirt ripping—happened until after G.P.'s 911 call.

{¶ 30} Pettaway also called 911 as part of his "care plan" for his posttraumatic stress disorder. When he feels unsafe, afraid, or suicidal, he is supposed to contact law enforcement and tell them that he is a disabled veteran under treatment and has firearms. He called 911 that day because he thought that he might lose his son if G.P. left with the child.

{¶ 31} The officers did not charge Pettaway with anything before they left his house. He learned about the charges a few days later from G.P.'s father. He denied threatening G.P. with a gun and thought that G.P.'s size and stature would make it difficult for him to pick her up and slam her on the floor multiple times.

{¶ 32} Pettaway said that G.P. was "[a]bsolutely" lying in court. Specifically, she lied about him getting guns out of the safe, ripping her wig off (because he did not take it completely off), starting the argument over housework, and locking the back door.

{¶ 33} On cross-examination, Pettaway confirmed that he had guns in the house on September 18. Although he told the 911 operator about the guns, he did not tell the responding officers. The door G.P. hit with the paver was a security door that would not

10.

break.  He agreed with the prosecutor that he was "safely inside" with G.P. locked outside, but he chose to unlock and open the door anyway.

{¶ 34} On redirect, Pettaway clarified that he opened the locked door and let G.P. back into the house because he wanted her to stop hitting the door and to assess the damage she had done.  He thought that G.P. was going to hit him with the paver when she first picked it up.  G.P. pushed him as soon as he opened the front door.  He grabbed her shirt after she pushed him.  After grabbing her, he "backed up" and "just let her go."

{¶ 35} After Pettaway testified, he rested.

{¶ 36} The court found Pettaway guilty of both charges.  When it announced its verdict, the court specifically said that it found G.P.'s testimony credible.  It acknowledged the discrepancies in the police reports but found that G.P.'s claim that Pettaway pulled her from the couch and dragged her around was "somewhat synonymous with" her being slammed to the ground.  It also pointed out that G.P. consistently said that Pettaway pulled off her wig; Wittmann found her claims, combined with the visible injury he saw, sufficient to charge Pettaway; and it was not unusual for a domestic violence victim to inquire about a police report.  Additionally, the court found that the facts did not support a self-defense claim because Pettaway did not tell the 911 operator or the responding officers that G.P. tried to damage the house or sufficiently explain why he unlocked the door to let G.P. back in the house.

{¶ 37} At the sentencing hearing, the court sentenced Pettaway to 180 days in jail, all suspended, and placed him on probation.

11.

{¶ 38} Pettaway now appeals, raising one assignment of error:

THE TRIAL COURT ABUSED ITS DESCRETION [sic] WHEN IT CONVICTED MR. PETTAWAY.  THE CONVICTION WAS CLEARLY AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE INTORDUCED [sic].  FURTHER, THE EVIDENCE THAT INTRODUCED [sic] WAS INSUFFICIENT TO SUPORT [sic] THE CONVICTION OR MEET THE CITY'S BURDEN OF PROOF.

## II. Law and Analysis

{¶ 39} In his sole assignment of error, Pettaway argues that his convictions are not supported by sufficient evidence and are against the manifest weight of the evidence.  He contends that "it is clear the City failed to meet its burden of proof in this case" because of G.P. "giving two different stories to TPD and the concurring opinion of two TPD officers that no one should have been charged . . . ."  He also argues that his convictions are not supported by the manifest weight of the evidence, essentially because G.P.'s testimony was not credible.  The city responds that the trial court "weighed the credibility of the witnesses and determined that there was sufficient evidence to support a conviction beyond a reasonable doubt" and there is no miscarriage of justice in this case because the trial court heard both sides of the story and decided that G.P.'s testimony was more credible.  We address each argument in turn.

### A. Pettaway's convictions are supported by sufficient evidence.

{¶ 40} First, we find that the evidence sufficiently supports Pettaway's convictions.  In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a

12.

reasonable doubt." *State v. Smith*, 80 Ohio St.3d 89, 113 (1997). We do not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 2008-Ohio-2762, ¶ 132. "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 2016-Ohio-8448, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.* Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 41} To convict Pettaway of domestic violence, the city was required to prove that he knowingly caused or attempted to cause physical harm to a family or household member. R.C. 2919.25(A). To convict Pettaway of assault, the city was required to prove that he knowingly caused or attempted to cause physical harm to another. R.C. 2903.13(A). A person acts "knowingly" when, regardless of his purpose, he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Physical harm" includes "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A spouse who is residing with a defendant is a "family or household member." R.C. 2919.25(F)(1)(a)(i).

{¶ 42} The prosecution is not required to show that the defendant intended the end result to prove that he acted "knowingly." *State v. Turner*, 2024-Ohio-684, ¶ 90 (2d Dist.); R.C. 2901.22(B). Instead, the prosecution must show that the defendant acted with awareness that the conduct will probably cause such harm. *State v. Chambers*, 2024-Ohio-3341, ¶ 181 (6th Dist.). In other words, "it is only necessary that the result is

13.

within the natural and logical scope of risk created by the conduct[.]" *Turner* at ¶ 90, citing *State v. Pierce*, 2023-Ohio-528, ¶ 24 (8th Dist.).

{¶ 43} Further, the slightest injury is enough to prove physical harm, and the injury does not have to be visible. *State v. Williams*, 2023-Ohio-4456, ¶ 15 (6th Dist.). A defendant can be convicted under R.C. 2903.13(A) and 2919.25(A) even if the victim is not injured *at all* because the statutes criminalize causing *or attempting to cause* physical harm. *City of Oregon v. Snyder*, 2008-Ohio-6537, ¶ 15 (6th Dist.); *Turner* at ¶ 89. Pushing a person or pulling their hair can be evidence that the defendant caused or attempted to cause physical harm. *State v. Rohm*, 2010-Ohio-1240, ¶ 13 (2d Dist.); *Turner* at ¶ 89; *In re Mark M.*, 2000 WL 125800, *2 (6th Dist. Feb. 4, 2000). Bruising is also evidence that the defendant caused physical harm. *State v. Elkins*, 2024-Ohio-1314, ¶ 28 (12th Dist.).

{¶ 44} In this case, the trial court had before it evidence from G.P., Pettaway's wife, that Pettaway picked a fight with her, which ultimately led to him pulling her off of the couch, "drag[ging]" her on the floor, tearing her shirt and bra, ripping out her hair by "snatch[ing]" off the wig that was glued to her head, pushing her while she was holding their child, bruising her arm, and displaying his guns. Pettaway's actions caused G.P. pain and resulted in bald patches on her head. There is also some evidence that G.P. sought treatment at a hospital following this incident.

{¶ 45} From Pettaway, the court had evidence that G.P. started the fight after Pettaway asked her about a separation; two different officers took reports on two

14.

different days and reported versions of G.P.'s story that differed in several significant respects; G.P. hit their door with a brick; he was concerned that G.P. might hit him with the brick; G.P. pushed him, he did not push her back, and they both somehow fell to the floor; and G.P. had punched him when he asked her for a separation about a week before this incident.

{¶ 46} Based on this evidence, a rational trier of fact could have determined that Pettaway knowingly caused or attempted to cause physical harm to G.P.  G.P. testified that Pettaway pulled her glued-on wig off her head, which caused her pain, pushed her into a door, and caused bruising on her arm, which meets the physical harm elements of assault and domestic violence.  Her testimony also showed that Pettaway pulled her hair with enough force to detach her glued-on wig, threw her on the floor, and pushed her into a door, causing pain and bruising and leaving bald spots on her head.  These consequences are within the natural and logical scope of risk created by forcefully pulling someone's hair, throwing them to the floor, and pushing them, which meets the knowingly elements of assault and domestic violence.  Therefore, G.P.'s testimony, if believed, was sufficient to show that Pettaway knowingly caused pain and bruising by throwing her to the floor and pulling off her wig—i.e., that he knowingly caused her physical harm.  *See State v. Sherman*, 2024-Ohio-5354, ¶ 172 (6th Dist.), citing *State v. Thompson*, 2017-Ohio-8375, ¶ 5 (10th Dist.) (the testimony of one witness, if believed, is enough to support a conviction).

15.

**{¶ 47}** At its core, Pettaway's argument relates to credibility. That is, he essentially claims that G.P.'s testimony was not credible because of the discrepancies in the police reports, and the officers' testimony about their charging decisions was more credible than G.P.'s testimony. However, this does not affect the outcome of our sufficiency analysis because we do not consider the credibility of witnesses when reviewing the sufficiency of the evidence. *Were*, 2008-Ohio-2762, at ¶ 132. Thus, we conclude that Pettaway's convictions are supported by sufficient evidence.

**B. Pettaway's convictions are not against the manifest weight of the evidence.**

**{¶ 48}** We also find that Pettaway's convictions are not against the weight of the evidence. When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed, and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson*, 2012-Ohio-6068, ¶ 15 (6th Dist.), citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

16.

{¶ 49} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the trial court's credibility determinations, given that it is the court that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 2012-Ohio-616, ¶ 14 (6th Dist.). The trial court, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 2008-Ohio-1557, ¶ 62 (6th Dist.), citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 50} After carefully reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that this is an exceptional case in which the evidence weighs heavily against a conviction. Pettaway primarily relies on the discrepancies between Wrobel's and Wittmann's police reports to attempt to discredit G.P.'s testimony. It is true that Wittmann's report—but not Wrobel's—indicates that G.P. told him about Pettaway taking her phone and watch, blocking her from leaving the house, and pulling out his guns during their argument. However, Wrobel's body camera shows that G.P. told him that Pettaway took her phone and watch, "grabbed [her] and ripped [her] hair off . . . [,]" and pushed her while she was holding their child. Although Wrobel opted to not include some of those things in his report, we cannot discredit G.P.'s testimony simply because the responding officer did not find those details relevant enough to include in his report. Nor can we entirely discount her testimony because of

17.

her failure to give Wrobel some of the details that she gave Wittmann. And we note that Wittmann reported seeing bald spots on G.P.'s head when she went to the police station on September 21, which corroborates her testimony about Pettaway pulling off her wig.

{¶ 51} On the whole, given the evidence before it, the trial court did not clearly lose its way by finding Pettaway guilty. Accordingly, Pettaway's convictions are not against the manifest weight of the evidence, and his assignment of error is not well-taken.

### III.     Conclusion

{¶ 52} Based on the foregoing, the May 24, 2024 judgment of the Toledo Municipal Court is affirmed. Pettaway is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See, also,* 6th Dist.Loc.App.R. 4.

| Christine E. Mayle, J. | [[Applied Signature]] |
| | JUDGE |
| Gene A. Zmuda, J. | [[Applied Signature 2]] |
| | JUDGE |
| Myron C. Duhart, J. | [[Applied Signature 3]] |
| CONCUR. | JUDGE |

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.